## MADDOX vs. SIMMONS AND GRIFFIN.

1. When the verdict of the Jury is strongly and decidedly against the weight of the evidence, and the Court is satisfied that justice has not been done, a new trial will be granted.

2. Mere weakness of mind, if the person be legally *compos mentis*, is no ground for setting aside a contract.

3. The Bar in fixing the standard of legal competency to contract, has taken, a low standard of capacity.

4. Imbecility and eccentricity of mind, not the same.

5. In the absence of fraud, or deception, the Court will rarely set aside a con-- tract on account of inadequacy of consideration; though gross inadequacy' may be looked to as an evidence of imposition.

6. It may be well said, that in the absence of fraud, mere inadequacy of con- sideration, is no ground for avoiding a contract.

7. In cases where imbecility of mind and inadequacy of consideration unite— especially where these are united of an abuse of confidence which the one party reposed in the other—the Court.has granted relief without other evi- dence of imposition.

8. The Court is not bound to decree a specific performance in any case, where it would not set aside the contract; nor to set aside any contract that it would not order to be specifically performed.

In Equity, in Putnam Superior Court. Tried before Judge HARRIS, at the September Term, 1860.

Alfred Simmons and William S. Griffin, filed their bill in equity, in the Superior Court of Putnam county, against John Z. Maddox, the allegations of which are substantially as fol- lows, to wit:

In November, 1856, Green Simmons died in Putnam county, intestate, and without issue; that at the time of his death he was entitled, as of his own right and property to the fol- lowing negro slaves, to wit: Maria, aged fifty years, and worth one hundred dollars; Dawson, aged seventeen years, and worth eleven hundred dollars; Nancy, aged thirteen years, and worth eight hundred dollars; John Wesley, aged eight years, and worth six hundred dollars; Raymond, aged five years, and worth one hundred dollars; and Merrill, aged four years, and worth three hundred dollars. Also, the following property, to wit: five head of cattle, worth twenty- five dollars; one buggy and harness, worth forty dollars; a lot of carpenter's tools, worth fifty dollars; a silver watch,

**IMBECILITY OF GRANTOR.  The jury found that the father's mind was strong enough to make the contract.** "The consideration of the deed is the continued support of the father by this son, to whom it was made. It is not a condition precedent. It is not pretended that he is unable to comply with his contract, and the only dispute is in respect to whether he has done so or not. The remedy is for failure to do so,. the contract being executed, by action at law for damages. Such remedy being inadequate and complete at law, equity will not interfere to set aside the conveyance. These points control the case, and the judgment.

worth fifty dollars; one double barrel gun, worth forty dollars; and four trunks, worth twenty dollars, besides other property of the value of one thousand dollars; that at the May Term, 1858, of the Court of Ordinary of Putnam county, letters of administration on the estate of the said Green Simmons, deceased, were regularly granted to the complainants; that after their qualification as administrators, they were informed, that the said John Z. Maddox had in his possession, the negro slaves aforesaid, as well as the other property before enumerated; that on the 5th day of May, 1858, complainants demanded the said property, and the said Maddox refused to deliver it up; that the said Maddox claimed the negroes under and by virtue of a bill of sale made by the deceased in his lifetime, and an agreement made by said Maddox at the same time, both being dated the 8th of November, 1855, and which are as follows, to wit:

GEORGIA, Putnam County:—

This indenture, made and executed this, the eighth day of November, 1855, between Green Simmons of the first part, and John Z. Maddox of the other part, both of the county and State aforesaid, witnesseth: that, for and in consideration of the sum of five dollars by the said John Z. Maddox, to the said Green Simmons in hand paid, at, and before the sealing and delivery of these presents, the receipt of which is hereby acknowledged, as well as for the undertaking, on the part of the said John Z. Maddox, that he will furnish to the said Green Simmons, a comfortable home, and give him a decent support for the balance of his life, and a decent Christian burial to his body after his death; he, the said Green Simmons, hath granted, bargained, and sold, and for the consideration above stated, does, by these presents, grant, bargain, and sell, unto the said John Z. Maddox, the following nine negroes, and their increase, to wit: Maria, Caroline, Henry, Sam, Dawson, Nancy, Raymond, Wesley, and Merrill, the child of the woman Caroline; to have and to hold said named property and its increase, to him, the said John Z. Maddox, and his heirs forever. And the said Green Simmons doth hereby warrant the title to the said property herein conveyed, to the said John Z. Maddox, his heirs and assigns, against himself, his heirs and assigns, and against all and every other person, and especially against the title of Robert A. Ladd, and all claiming under him; he, the said

is affirmed. See 31 Ga. 512: 43 Ga. 79; 6 Ga. 325; Code of 1895, §3941. 5 Ga. 400." Lindsay v. Lindsay, 62 Ga. 550 (2). .
"There was not sufficient evidence of mental incapacity to authorize the jury to set aside voluntary deeds made by the grantor to certain of his children and grandchildren, there being no evidence of fraud
VOL. XXXI 33

Simmons, especially, hereby revoking the instrument made in favor of the said Ladd, embracing said negroes, and other property, the same being but a last will and testament in effect, and so intended when made.

In witness of all which, and to carry out the full intention of the above, the said Green Simmons hath hereto set his hand and seal the day and date above written.

Signed, sealed and delivered in the presence of C. S. Criddle, F. W. Perryman and G. W. Denham.

[L. S.]                    GREEN SIMMONS.

GEORGIA, Putnam County:

I, John Z. Maddox, of the county and State aforesaid, do hereby accept the above and foregoing deed, with its conditions, and do agree, on my part, to perform that part of the contract binding on myself.

In witness of which, I have hereunto set my hand and seal, this, the 8th of November, 1855.

Signed, sealed, and delivered in the presence of C. S. Criddle, F. W. Perryman and G. W. Denham.

JOHN Z. MADDOX.

That the total value of the slaves embraced in said instrument of conveyance, was fifty-five hundred dollars; that, at the time of making said bill of sale, and for many years previous thereto, the said Green Simmons was, and had been imbecile in mind, and incapable of making a valid contract; that he was foolishly credulous, unstable, and subject to be imposed upon by any one disposed to take advantage of his condition; that the said John Z. Maddox procured said Green Simmons to make said bill of sale, by fraud, false promises, misrepresentation, and the exercise of undue influence over, and upon the said Green Simmons at a time when his condition of mind and body were such as to cause him to yield to the most foolish and unreasonable propositions, and when he was utterly incapable, from mental weakness, of resisting the importunities of the said John Z. Maddox; that after thus obtaining the said conveyance, on the terms and conditions therein recited, and on which alone the said conveyance was obtained, the said John Z. Maddox did not furnish the said Green Simmons with a comfortable home, but put him off without any white attendant, and did not take care of him, or give him a decent support; but, on the contrary, neglected

practiced or undue influence exerted upon him." Richardson *v.* Adams, 110 Ga. 425, 427.

"**Proof of weakness of mind not amounting to imbecility is not sufficient to warrant the jury in setting aside a contract,** there being no proof of fraud or undue influence. Maddox *v.* Simmons, 31 Ga. 512; Richardson *v.* Adams, 110 Ga. 425." Nance *v.* Stockburger, 111 Ga. 821.

"A charge in almost the same language as that complained of was,

him during sickness, and suffered him to die in utter neglect, and without attention or comfort; that the negro man, Henry, mentioned in the deed, was sold by the sheriff of Putnam county, on the first Tuesday in November, 1856, to satisfy sundry *fi. fas.* issued from the Superior, Inferior, and Justices' Courts of said county, from judgments, some of which were obtained against the said Green Simmons before, and others after the date of said bill of sale; and that at said sheriff's sale, the said John Z. Maddox became the purchaser of said slave (Henry), at the price of twelve hundred and fifty dollars, three hundred and forty-nine dollars and sixty-eight cents of which sum the said John Z. Maddox retained, after paying off the sums due on the *fi. fas.;* that the negro Caroline, never did go into the possession of the said John Z. Maddox; and that said Caroline and Maria, are now dead; that Green Simmons never did deliver the negroes, and other property mentioned in the bill, to the said John Z. Maddox, but that he took possession of the same wrongfully; that the aggregate value of the slaves in the defendant's possession, at the time of filing the bill, is forty-five hundred dollars, and their annual hire is worth, in the aggregate, two hundred dollars.

The complainants pray, that the charges of the bill may be fully answered by the defendant; that the bill of sale may be set aside and annulled; that the defendant be decreed to deliver up the property to complainants, and account for the hire thereof; and that complainants may have such other relief as the facts of their case call for in equity.

The defendant filed his answer to the complainants' bill, in which he admits the death of Green Simmons without will and without issue; that complainants are the administrators of deceased, and that they demanded the property of defendant, which he did not deliver to them; that the negroes are correctly enumerated in the bill, and such of them as are alive, are in his possession, and are worth the sum stated in the bill, as to value and hire. The defendant also admits the making of the bill of sale and agreement set forth in the bill, but denies positively that the said Green Simmons was imbecile, or in any manner mentally incapable of making a valid contract; he also denies every charge made against him in the bill, of all imposition, false promises, fraud, undue or improper influence used to induce said Green Simmons to

in Frizzell *v.* Reed, 77 Ga. 724, held to be sound law, although it was there said that it was not appropriate to the peculiar facts of that case. See also, in this connection, Clark on Contracts, 263; §141. In Maddox *v.* Simmons, 31 Ga. 512, 527, Judge Lumpkin used this language: 'I assume, in the first place, that **to establish incapacity in a grantor, he must be shown to have been, at the time, non compos mentis,** in the legal acceptation of that term, **which means, not a partial, but an entire,**

make the bill of sale, and insists that the transaction was fair and honorable, and founded on a good, fair and valuable consideration, and executed in the utmost good faith. The defendant also denies every allegation of the bill, charging him with a failure to comply with his part of the contract set forth in the bill, and insists that he gave him, the said Green Simmons, a comfortable home and a decent support, to the hour of his death; that he offered the deceased a home, either at the hotel in Eatonton, or where the defendant then boarded; that said deceased preferred to remain at the defendant's plantation; that the defendant gave the said Green Simmons the very best medical attention, employing an eminent physician to see him at the physician's discretion; that he gave him every comfort that could be procured, and from the time he was confined to his bed, that the defendant moved another bed to the house, and remained constantly with him, until he died, whilst his relatives ignored him, and neglected him; that after the deceased died, the defendant gave his body a decent Christian burial at a spot selected by the deceased himself, in his lifetime, and that he, the defendant, fully and faithfully discharged every obligation required of him by the deed and contract. The defendant also admits that the boy Henry, was sold at sheriff's sale, and bought by him; that soon after the bill of sale was executed, Robert A. Ladd took out a possessory warrant for the slaves which deceased moved from Ladd's house, and the Court awarded the possession of said slaves to Ladd, and that the defendant was driven to a regular action of trover, to recover them from Ladd; that during the pendency of the action of trover, the creditors of deceased wanted their money, and the defendant not knowing how the action would terminate, was advised not to risk anything by paying off the debts, and hence suffered the negro, Henry, to be levied on and sold. The defendant admits that he retained the surplus of his bid after paying off the fi. fas. and insists that it was his right to do so; that since the execution of the bill of sale, he has paid for said Green Simmons, over and above said fi. fas., about one thousand dollars, first in the possessory warrant, then fees in the trover action, store accounts, physician's bill, burial expenses, besides his own time attending Court and waiting on the deceased, and that if it becomes necessary for his rights to do so, he claims them all; the de-

loss of understanding.' The rule thus laid down has been approved in two cases. See Nance v. Stockburger, 111 Ga. 821, and cit. There is no conflict between this rule and the one laid down in Frizzell v. Reed. Both recognize that in order to avoid a contract on account of mental incapacity, there must be an entire loss of understanding. The first case recognizes it in terms, and the second, in effect." Barlow v. Strange, 120 Ga. 1018.

fendant denies having any of the other property mentioned in the bill, but says that it was all disposed of by the said Green Simmons in his lifetime.

On the trial of the case in the Court below, the following evidence was adduced, to wit:

### Evidence for Complainants.

The bill of sale and agreement between Green Simmons and the defendant, dated 8th of November, 1855, and set forth in the bill.

The fact that Green Simmons died in November, 1856.

DR. CLOPTON testified: That, at the time of the trial, the negroes, Sam, Dawson, Nancy, Wesley, Raymond, and Merrill, were worth, in the aggregate, from four thousand to forty-five hundred dollars; that he knew Green Simmons well for twenty-five years, and attended him for many years as his family physician; lived within four miles of him for a time, and saw him every week; that Simmons always had a very weak mind, had no stability, and would fly off from the subject on which he was talking; after an attack of typhoid pneumonia, he was for several days entirely without mind, and his mind after that, was not as good as it had been before; after the attack of pneumonia, he did not consider him capable of contracting, and if dealing with him, would not consider that he was dealing with a man on equal terms; the attack of pneumonia occurred while Simmons lived at Ladd's, and before the bill of sale was executed.

*Cross-examined:* Simmons could beat witness killing wild turkeys. Witness traded with Simmons, took his note, sued him, and no motion was ever made by witness, or others, to have a guardian appointed for Simmons; he was fractious; had the character of being shrewd; was considered half-witted; witness saw but little of him after he went to defendant's; had a settlement with him when he and Ladd fell out.

ALEXANDER B. HARRISON and BLUMER WHITE testified: That they had known Green Simmons for forty years, and lived part of that time in the same neighborhood, but were never intimate with him. R. E. Claiborne sued Simmons in a Justice's Court, in which they presided. The suit was brought to recover the amount of an account founded on an order given by Simmons to Claiborne, to let his negroes have what goods they wanted whenever they came riding a certain gray horse. Simmons would first have sworn that he did not

give the order, but afterwards admitted that he did give it. The Court gave judgment against Simmons, and he appealed. On the second trial, Simmons swore than he did not give the order, whereupon there was a mistrial. On the third trial, Claiborne recovered. Witnesses thought, at the time, that he was incapable of making contracts, and ought to have had a guardian. Alfred Simmons is a brother of Green Simmons. Green Simmons had no wife or children, his wife having died.

*Cross-examined:* Simmons did not want to pay Claiborne's account, because he said that Claiborne let the negroes have goods when they rode the wrong horse. The trial was in August, 1855.

ROBERT E. CLAIBORNE testified: That he was present at the trial referred to by Harrison and White. Simmons contended that witness was to credit him when his negroes came upon a certain horse. Simmons afterwards told him to credit him when they rode any horse.

*Cross-examined:* From what transpired at the time, witness would not make any more contracts with Simmons. Witness did not think Simmons was a rascal trying to get the advantage.

JOSEPH BACHELOR testified: That he lived at Mr. Little's; that he was at a corn-shucking at Hargrove's, where the negroes were. William Maddox and John G. Maddox went off with the negroes, saying that Green Simmons had sent them for the negroes, and that they were going to take them to him. There was some liquor along, carried by a boy that William Maddox had with him. John Maddox stopped at Little's, where William Maddox lived at the time.

*Cross-examined:* Dr. John Maddox lived some fifteen miles from Little's, but attended the negroes as a physician.

ZACHARIAH ROUGHTON testified: That before William Maddox married, he said to witness, that Ladd had Simmons' negroes for his maintenance; that he, William Maddox, could get them on the same terms, and intended to do so; this was before the deed was executed. He said further, that Simmons was to give him twenty-five dollars to get the negroes, and that he did afterwards give him a silver watch, which he showed to witness. He further said, that Simmons would not live long, and he might as well have his negroes as Ladd.

*Cross-examined:* Has no kind feeling for William Mad-

dox, and has never heard defendant say anything on the subject.

LEWIS T. YANCEY testified: That he had known Simmons since 1843; was acting as bailiff in Simmons' district, and found him to be a man shifty and variable; fluctuating in business with him; regarded him uncertain; saw him give in his tax, estimating nine negroes at $3,000, and an old buggy that needed repairs, and a horse at $300; the negroes were better worth $6,000 than the horse and buggy were $300. In the trial of a suit, Simmons denied facts under oath, which he afterwards admitted to be true.

*Cross-examined:* The transaction occurred in 1857 or 1858; do not know whether he wanted to sell the buggy or not. Simmons was shifty and dodging in money matters. Witness, as bailiff, did not get much from him; he instructed witness to levy on property at Ladd's.

JONATHAN J. WINSLETT testified: That he had known Simmons a good while; sat on the jury on the trial referred to by Harrison and White, and confirms what they stated, also confirms what Yancey testified to, as to Simmons giving in his tax.

LEWIS T. YANCEY, reintroduced, testified: That the keeping of Simmons was worth one hundred dollars per year.

The *fi. fas.* mentioned in the bill, under which the negro boy Henry was sold, were read in evidence.

DR. THOMAS CLOPTON being reintroduced, testified: Simmons was fifty or sixty years old; had pneumonia, which left him with a cough; he lived twelve or eighteen months after he went to the defendant.

### Evidence for Defendant.

COL. NATHANIEL G. FOSTER testified: That his fee in this case was not conditional; that a short time before the bill of sale was executed, Dr. John Z. Maddox brought to his office a copy of a paper, executed by Green Simmons to Robert Ladd, with a message that Simmons desired witness' opinion in reference to the revocability of said paper. Simmons wanted the witness to draw up a paper conveying the negroes to Maddox in consideration of his maintaining him during his life; that he drew the paper, delivered it to him in blank, with instructions as to its execution: that sometime thereafter Simmons came to witness' house in Madison, and stated

that Ladd had treated him badly; had cursed him and told him to take his negroes away; that Simmons went to Maddox's to live, and after he got his negroes away, Ladd got out a possessory warrant for them; that he is certain Simmons came to see him once or twice. Witness was coming to Eatonton, and acording to promise called at Mrs. Maddox's. Simmons came there with a boy behind him; Ladd had all the other negroes. On that day Simmons urged and entreated Maddox to sue for the negroes; advised him to bring an action of trover. Maddox was indisposed, and very reluctant to take the risk and trouble. Simmons urged him to sue, as he thought him under obligation to do it. Witness so advised himself. Maddox employed witness to bring the suit. On the trial of the case, witness consulted with Simmons, and found him very useful, and preferred him to Maddox for assistance. Simmons was very shrewd; understood the points in the case, and suggested very pertinent questions to be asked of the witnesses; indeed he was the important man in making, suggesting facts and points during the trial of the case against Ladd. The deed to Maddox had then been executed, and the title was understood to be in Maddox. Maddox boarded at Boswell's about ten or eleven miles above Eatonton. Simmons lived four miles from Eatonton. Witness got to Mrs. Maddox's about 11 o'clock A. M., and Simmons came about 2 o'clock P. M. Simmons, William and John Maddox and T. M. Collinsworth were all there: the conversation was about the controversy between Ladd and them. Simmons did most of the talking. William Maddox came to see witness after he was arrested; he was living then at Little's; he talked about the possessory warrant case, and was defended by Lucian Dawson. Witness never discovered that Simmons was weak or imbecile; he was a shrewder man than Maddox. If witness had to trust his rights with Simmons or Maddox in a trade, he would prefer Simmons. Simmons knew that the title to the property was in Maddox, so recognized it and was satisfied with it up to the last interview witness had with him.

*Cross-examined.*

Simmons came up to witness' house after the fuss with Ladd—did not see Maddox—Simmons was living with Maddox at the time. Maddox brought the deed to Simmons.

Witness told Maddox that he would have to pay the debts of Simmons, although he did not insert a clause to that effect in the deed. Its omission, if a fault, is the fault of witness. Maddox took the property with that understanding. Witness' visit to Mrs. Maddox was in the summer, after the deed was executed. Simmons came unexpectedly to witness; he heard that witness was there, and came to consult with him about getting the negroes from Ladd.

Moses Presley testified: That he has known Green Simmons since the year 1818; he was very ingenious, and talked like a man of good sense. He came to the house of witness in Monroe, Walton county, and stayed there three days; he told witness that old man Maddox was always kind to him, and that John was so much like him that he wanted him to have his negroes; Simmons' mind and memory seemed to be good; witness talked a great deal with him; Simmons recollected perfectly, all the interesting incidents of their past life; recollected them better than witness did; Simmons said that he wanted to live with Ladd, but they treated him so badly he could not; that he was afraid Ladd would kill him; that once when he was sick, Ladd took him by the throat and jerked him out of the bed on the floor, and with an oath threatened to stamp his liver out; that Ladd made a great fuss because he stood in his own house and shot through the window, at a chicken in the yard; that he was afraid Ladd would poison him; that Maddox had given him a home; that he was better satisfied than he had ever been before, and that he wanted Maddox to have his negroes.

*Cross-examined.*

William Simmons, a cousin of Green Simmons, was a son-in-law of old man Maddox, the father of John Maddox; Green Simmons lived at old man Maddox's, and had a gun-shop; witness lived near them; witness has lived out of Putnam county for fifteen years. When Simmons was at witness' house in Monroe, he talked of old matters, that witness had forgotten; Simmons said that he was afraid to drink coffee at Ladd's, and that Ladd had treated him cruelly when he was sick.

Donaldson Pritchard testified: That Green Simmons was his brother-in-law; witness knew him up to the year 1853; he was a shrewd man, and had a fair mind; he was not con-

sidered to be of weak or imbecile mind; witness had nothing to do with him, because he did not like Simmons' way of doing business.

### Cross-examined.

Simmons was eccentric, irascible and unreliable; he would often feign to be angry upon slight cause; he was peculiar, and would promise one thing and do another.

WILLIAM W. GARRARD testified: That Green Simmons married his sister, and he knew him from 1806 up to the time of his death; he was more knave than fool, and always got the advantage in dealing if he could; some years ago he wanted witness to advance some money to him, and move the negroes to Texas for witness'·sister to have them; he said the negroes come from her family, and she ought to have them, and that he could get them out of Ladd's hands very easy.

*Cross-examined:* Simmons lived· with Ladd after the conversation about the negroes; Simmons was a peculiar man and would not stand to his contracts; he was not friendly with his brothers, and told witness that he would not speak to any of them.

ZACHARIAH EDMONDSON testified: That he and Simmons were boys together; that witness regarded him as having an ordinary good mind, with remarkable cunning for one of his sense; he lived on witness' land in 1843, and called on witness to write a will for Ladd, which he did; afterwards he wanted it altered, which was done; afterwards he came and wanted his property to be given to him or his children; Henry to his son William; Sam to Sidney; he did not want Ladd to know of the will; after the will was execute d he asked witness for money which he loaned to him and took his note; his son told witness that on a certain occasion, Simmons swore that he lived in Hancock county, and gave as a reason for so swearing, that he had engaged boarding in that county for the purpose of carrying on some litigation there; saw him when sued make out a set-off against the plaintiff about equal to the plaintiff's claim; he resided in Putnam when he swore that he lived in Hancock; after he fell out with Ladd, he sent a negro to witness' house to get back there; came also himself for that purpose. Witness wanted to give him five thousand dollars for his negroes, and also support him during his life, the amount to be payable at witness' death, but he refused.

*Cross-examined:* Simmons could not be easily imposed upon; he lived on witness' place in 1848, 1850, 1851, and 1852, and he was with him often; he then went to Ladd's. When he left witness' place he was as capable of disposing of his property as witness was; witness does not know where William Maddox lived in 1855. About the time Simmons went to Ladd's, Ladd had great influence over him.

CULLEN S. CRIDELL testified: that he witnessed the deed from Simmons to the defendant; saw some of the negroes there at the time, and understood that they were delivered at the time. Witness read the deed to Simmons, who executed it freely and voluntarily.

*Cross-examined:* The deed was executed at Dr. Maddox's one mile distant from witness' house; Maddox requested witness to go; no one present but the witnesses and William Maddox; witness remained probably one hour; Simmons then lived at Dr. Maddox's plantation; he was sixty or sixty-five years old; he did not lie down while witness was there, but he was feeble; thinks Mr. Tucker was also present. Dr. Maddox then lived at Boswell's, and he thinks Simmons lived at the plantation by himself; James Maddox was often there; William Maddox lived in the lower part of the county, and was sometimes there; thinks Simmons was capable of making the deed, and comprehended it.

JAMES W. MAPPIN testified: That he had been acquainted with Green Simmons ever since 1843, and had frequent interviews with him; heard him speak of having had difficulties in getting his property; he spoke of his intimacy with old man Maddox, and said John was a "chip off the old block"; he said he was well provided for by defendant, and that he was perfectly satisfied. Witness proposed to send him table luxuries if he needed any, but he declined them, saying that defendant provided him with all such things that he desired; witness saw his table furnished with such delicacies; Simmons said he was too sharp for Ladd. He saw nothing that indicated weakness of mind in Simmons, and it did not so much as occur to the witness, that he was ever supposed to be of weak mind; he seemed perfectly to understand the nature and import of the deed to defendant; he had negroes to wait on him. Witness would not take care of him as Maddox had done, for five hundred dollars a year. Simmons lived in the house where Maddox now lives, about one hundred and fifty yards from witness' plantation.

*Cross-examined:* Simmons lived alone until Maddox moved there, after he was taken sick; he lived there about one year. Witness received an order written in one hand, and signed in a tremulous hand by Simmons, directing witness to pay the residue of the price at which Henry was sold, to Maddox. William Maddox lived at Robert Little's.

*Re-examined:* Simmons made a sun-dial while at Maddox's, and took witness out in the yard to see it, and explained the principles of it to witness.

JAMES M. LUCKEY testified: That he went to Monroe with Simmons, in a buggy, after the deed to defendant was made; he went to Moses Presley's. On the road from Madison to Monroe, Simmons told him that he was satisfied with the arrangement with Maddox; that he had previously made a will in favor of Ladd, knowing that it was a will at the time, and designing it as such, but that the paper to Maddox was safe; that he did not like his brothers, and did not intend that they should ever have anything he had, as they had never treated him with kindness or justice.

*Cross-examined:* Witness is defendant's nephew. The conversation testified to, occurred on the road, and thinks Simmons introduced it, but is not certain; thinks it was in December, 1855; it was after the deed was executed. Simmons and witness started from defendant's plantation; Simmons had a cough, and was feeble; witness went to Monroe on business of his own, and stayed three or four days, and came back with Simmons; it was cold weather.

Col. ISHAM S. FANNIN testified: That he was employed to attend to some possessory warrant cases by Simmons, who gave him the history of the cases, and witness found on the trial, that the statement was about as accurate as the statements of clients usually are, in regard to their cases; he saw no defect of mind, or memory, in Simmons; he gave a very intelligent account of the whole case; he told witness that he had gotten William Maddox to get the negroes out of Ladd's possession.

*Cross-examined:* At the time Simmons came to Madison to see witness, a negro boy came with him. William Maddox and defendant were counselling with Simmons at the trial of the possessory warrants; it was very cold weather at the time of the trial. Witness had never been acquainted with Simmons until he saw him in connection with the trial,

and did not think he was under the control of the Maddoxes; he had but little conversation with him here at the trial.

ALBERT G FOSTER testified: That he was with Col. Fannin at the time testified to by him; he saw Simmons three times in Madison pending the possessory warrants, about the result of which he seemed to have great apprehension; he did not regard Simmons as having a very strong mind, but ordinary and adequate to the transaction of business; he took the lead in counselling the attorneys and making them suggestions. On the trial, Simmons' statements were verified by all the witnesses except Ladd's son, at whose testimony Simmons was much surprised; he saw no want of mind in Simmons. Maddox was with him one time when he came to Madison, the other two times there was no white person with him.

*Cross-examined:* Saw Maddox in Madison, though not with Simmons. William Maddox talked freely about almost everything; he talked particularly about having been arrested by Ladd with a possessory warrant, and was not satisfied with the result of the trial, as it seemed to leave an imputation on his character. Defendant was with Simmons in Madison pending the possessory warrants; the first time witness saw defendant in Madison, was the day the deed was written.

DR. JOEL BRANHAM, in answer to interrogatories, testified: That he was acquainted with Green Simmons on the 18th of November, 1855, and had been acquainted with him for twenty-five or thirty years preceding his death; thinks that his mind and body both, at that time, were, in general, more enfeebled than they had been in his previous history; thinks that, at that time, he was mentally capable of understanding business affairs, of managing his own property, of entering into contracts with reference to business and property; thinks that he was capable of understanding and appreciating the nature, import and obligation of contracts of that character at the time; thinks that his mind was not in such a condition as to render him an easy victim of fraud, imposition and cunning on the part of others; thinks that he was capable of managing his own affairs, and controlling his property with good sense; his mind differed partially from that of other men of common sense and prudence, which resulted partially from general imbecility and weakness, and from oddity and eccentricity; partially from a defect of par-

ticular organs, and from weakness of the entire mental organism; witness was called in as a physician to visit him in his last sickness at the request of Dr. John Z. Maddox, who paid his medical bill; he was requested by Maddox to continue visiting Simmons as long as he thought it necessary, and to do all in his power to make the case of Simmons comfortable while he lived; Dr. Maddox attended his case, and the witness assisted him until within a day or two of his death; he died of pulmonary consumption; thinks he had all the attention that one in his situation could require, and all was done that could be done to make him comfortable; he had a comfortable house and servants to attend him, and upon every visit the witness made him, defendant was with him, and requested witness to make known to him (defendant) any article of food or drink that would make Simmons comfortable, so that they might be procured, and at the suggestion of witness, defendant did procure such things several times.

To cross-interrogatories he testified: Thinks that he was with Simmons, at the house of Dr. Maddox, on the 18th of November, 1855, in company with defendant and his brother, James Maddox; does not know how long anterior to that day, or under what circumstances, Simmons left Ladd's and went to Maddox's; he lived two or three weeks after witness was called to see him; on his first visit, witness decided that Simmons had consumption and was obliged to die, and so announced to Simmons and Maddox; it is one of the peculiar characteristics of consumption, that the patient retains his mental faculties in a large majority of instances to the last.

Upon this evidence the jury under the charge of the Court, returned a verdict and decree; that the bill of sale be set aside and vacated, and that the defendant deliver it up to be cancelled; also that defendant deliver to the complainant the negroes in dispute, and that the complainants refund to the defendant two hundred and twenty dollars.

Whereupon, counsel for defendant moved for a new trial of said case on the following grounds, to wit:

1. Because the Court erred in his charge to the jury in saying: "Gentlemen, the great battle-ground in this case, is the inadequacy of the consideration of the deed to the defendant."

2. Because the Court erred in failing to charge the jury:

that "the contingency of a recovery of the negroes from Ladd by Maddox should be considered by them, in determining the consideration of the deed," although the point was distinctly made, and argued before the jury by defendant's counsel.

3. Because the manner and emphasis of the Court in charging the jury were such as to lead them to believe, that in the Court's opinion the allegations of fraud and imbecility of mind, had been properly made out by the complainants.

4. Because the verdict was contrary to equity.

5. Because the verdict was strongly and decidedly against the weight of the evidence.

6. Because the verdict was contrary to law.

The presiding judge, in his decision of the motion for a new trial, does not certify to the truth of the "second" and "third" grounds taken in the motion, but denies that they are true. The motion was overruled, and the new trial was refused, and this decision is brought up for review.

N. G. FOSTER, WM. A. REID, DAVIS & LAWSON, for the plaintiff in error.

JUNIUS WINGFIELD, JOHN W. HUDSON and E. A. & J. A. NISBET, for the defendants in error.

*By the Court.*—LUMPKIN, J., delivering the opinion.

After carefully investigating the facts in this case, we are forced to the conclusion, that the verdict of the jury is strongly and decidedly against the weight of evidence. We shall not, however, enter upon a review of the testimony to demonstrate the correctness of this result. The proof speaks for itself.

We prefer stating some general principles applicable to this investigation, and then submit it to the reconsideration of another jury, disclaiming all wish or intention to constrain them to a finding which their own judgments do not approve.

I assume, in the first place, that to establish incapacity in a grantor, he must be shown to have been, at the time, *non compos mentis,* in the legal acceptation of that term; which means, not a partial, but an entire, loss of understanding. The common law has not drawn any discriminating line by

which to determine how great must be the imbecility of mind to render a contract void, or how much intellect must remain to uphold it. Weakness of understanding is not, of itself, any objection to the validity of a contract. If a man be legally *compos mentis,* he is the disposer of his own property, and his will stands, for the reason of his actions. *Jackson vs. Caldwell,* 11 *Cowen,* 207; *Odell vs. Buck,* 21 *Wend.* 142; *Stewart vs. Lispenard,* 26 *Wend.* 298 *et seq.; Clark vs. Fish,* 11 *Paige,* 171; *Blanchard vs. Nettle,* 3 *Denio,* 37; *Osterhout vs. Shoemaker, Id., note; Dean's Med. Jur.* 555 *et seq.;* 2 *Mad. Ch. Pr. et seq.*

To establish any other standard of intellect or information beyond the possession of reason, in its lowest degree, as in itself essential to legal capacity, would, as said by Senator Verplanck, in the great case already cited (*Stewart's Ex'rs vs. Lispenard,* 26 *Wend.* 203), create endless uncertainty, difficulty and litigation; would shake the security of property, and wrest from the aged and infirm that authority over their earnings and savings, which is often their best security against injury and neglect. If you throw aside the old common law test of capacity, then proofs of wild speculation or of extravagant and peculiar opinions, or the forgetfulness or prejudice of old age, might be sufficient to shake the fairest conveyance, or impeach the most equitable will. The law, therefore, in fixing the standard of positive legal competency, has taken a low standard of capacity; but it is a clear and definite one, and therefore wise and safe. It holds, in the language of a late English commentator (*Shelford on Lunacy, p.* 39) that weak minds differ from strong ones, only in the extent and power of their faculties; but unless they betray a total want of understanding, or idiocy, or delusion, they cannot properly be considered unsound.

Nor is inadequacy alone a sufficient ground, in ordinary cases, for setting aside a conveyance of property. *Fonb. Eq. B.* 1 *ch.* 2, §9, *note* 2; *Osgood vs. Franklin,* 2 *Johns. Ch. Rep.* 23; *Blackford vs. Christian,* 1 *Knapp's Rep.* 77; *Dunn vs. Chambers,* 4 *Barbour,* 376. In the leading case on this subject (*Heathcote vs. Paignon,* 2 *Br. C. C.* 167), Lord Thurlow said, if the Court takes such a ground as to rest upon the market price, every transaction of the kind would come into equity; and in *Gwynne vs. Heaton,* 1 *Bro. C. C.* 9, Lord Thurlow said, that to set aside a conveyance,

there must be an inequality so strong, gross and manifest, that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it; and this doctrine was approved by Lord Eldon, in *Coles vs. Trecotheck,* 9 *Ves.* 246; also, in *Gibson vs. Leyes,* 6 *Ves.* 273; and by Sir Wm. Grant, in *Peacock vs. Evans,* 16 *Ves.* 512; and by Chancellor Kent, in the case of *Osgood vs. Franklin,* already referred to.

Courts are not willing to enter into the question, whether the consideration be adequate in value to the thing which is promised in exchange for it. *Hubbard vs. Coolidge,* 1 *Metcalf,* 93; *Bedel vs. Loomis,* 11 *New Hamp.* 9. "If a contract deliberately made, without fraud," said Wilde, J., in *Train vs. Gold,* 5 *Peek,* 384, "and with a full knowledge of all the circumstances, the least consideration will be sufficient." "If there be no suggestion of fraud," says Mr. Smith, "the Court will not hold the promise invalid upon the ground of mere inadequacy; for it is obvious, that to do so, would be to exercise a sort of tyranny over the transactions of parties, who have a right to fix their own value upon their own labor and exertions, and would be prevented from doing so, were they subject to a legal scrutiny on each occasion, on the question, whether the bargain had been such as a prudent man would have entered into."

"Suppose," says the same author, "I think fit to give a thousand pounds for a picture not worth fifty, it is foolish on my part; but if the owner do not take me in, no injury is done; I may have my reasons; I have detected in it the touch of Raphael or Correggio. It would be hard to prevent me from buying it, and hard to prevent my neighbor from making the best of his property, provided he do not take me in, by telling a false story about it."

There are two remarkable instances illustrative of the principle that, in the absence of fraud, mere inadequacy of consideration is no ground for avoiding a contract. See the two late cases of *Bainbridge vs. Firmston,* 1 *Perr. & Dav.* 2 (10 *Add. & Ell.* 309), *and Wilkinson vs. Oleviera,* 1 *Bingham, N. C.* 490 (27 *Eng. Com. Law Rep.*) in which the defendant promised to give the plaintiff £1,000 for the use of a letter which contained matters explanatory of a controversy in which he was engaged, and the consideration was held not to be inadequate to support the promise.

The are two *old* cases upon this subject—*Thornborou vs. Whiteacre,* reported in 2 *Ld. Raymond,* 1164, and *James vs. Morgan,* 1 *Lev.* 111, which will fully compensate the reader for reading. I have referred to them in my Law School, to show to what extent such Judges as Lord Holt have gone to sustain contracts, when assailed for want of consideration.

The first was an action in which the plaintiff declared that the defendant, in consideration of 2s. 6d. paid down, and £4 17s. 6d. to be paid on the performance of the agreement, promised to give the plaintiff 2 grains of rye corn on Monday, the 29th of March, 4 on the next Monday, 8 on the next, 16 on the next, 32 on the next, 64 on the next, 128 on the next, and so on for a year, doubling on every successive Monday, as counsel contended, but on every alternate Monday, as Judge Holt construed, *quod libet,* the quantity delivered on the last Monday. Mr. Salkeld, the Reporter, demurred to the declaration, arguing that, suppose the contract to be performed, the quantity of rye to be delivered would be 524,288,000 quarters (a quarter is 8 bushels!) and that all the rye grown in the world would not amount to so much. But Lord Holt said, that though the contract was a foolish one, it would hold at law, and the defendant ought to pay something for his folly. The case was compromised.

*James vs. Morgan,* 1 *Lev.* 111, is the old case in which the horse was sold for one barley corn for the first nail in the horse's shoe, two for the second, and so doubling on each nail. The jury found, under the direction of the Court, £8, the value of the horse. The quantity of barley-corn was estimated at 500 quarters, or 4,000 bushels!

It is proper to add, that in cases where imbecility of mind and inadequacy of consideration unite, though neither standing alone, is sufficient, under ordinary circumstances, to invalidate a contract, the Court has granted relief, without other evidences of imposition; and especially is this the case where imbecility of mind and inadequacy of consideration is united with an abuse of confidence which the one party reposed in the other. *Clarkson vs. Hannay,* 2 *Pierre Wms.* 204; *Gibson vs. Jeyes,* 6 *Ves.* 266; *Crow vs. Ballard,* 1 *Ves. Jr.,* 215; *Mortleck vs. Buller,* 10 *Ves.* 292; *Dealty's Heirs vs. Murphey,* 3 *H. K. Marshall's Rep.* 475; *Whelan vs. Whelan,* 3 *Cowen,* 537; *Whipple vs. McClure,*

*2 Root*, 216; *Per. Harris, P. J., in Dunn vs. Chambers, 4 Barb. 379.*

It need scarcely be remarked, that a Court is not bound to decree a specific performance in any case where it would not set aside the contract, nor to set aside any contract that it would not order to be specifically performed.

It will be for the jury to apply these rules of law to the facts of this case, carefully distinguishing between imbecility and eccentricity of mind. Many of the brightest intellects that ever lived have partaken of this latter infirmity, if indeed it be one. One circumstance that is incontrovertibly established, has weighed heavily upon our minds; and that is, that Green Simmons, to the day of his death, seems to have lived and died happy and content with the arrangement which he had made, or, to use his own emphatic language, the "chip off the old block" had not abused his confidence.

As to the other points, we have deemed it unnecessary to notice them. But as an act of justice to the presiding judge, we have thought it best to append his own opinion entire, to that of the Court. We confess to another motive. Will he pardon the liberty? It will daguerreotype to posterity the peculiarities of our most excellent brother far better than any *post-mortem* eulogy of ours, should Providence impose this duty upon us, which, may Heaven, in its mercy, avert.

## JUDGE HARRIS' OPINION.

"I have, since the indication of my opinion, on the last day of Putnam Superior Court, on the several grounds contained in the motion by defendant for a new trial, given to the bill, answer, brief of testimony filed, and the interrogatories in the case, a very careful perusal. This was due to the movant; it was due to myself, as my opinions were by no means so fixed as to be unchanged by more mature consideration.

"There is more in the testimony upon which the verdict can be well supported than I had thought there was during the progress of the trial, or at the time when the motion was made for a new trial.

"And whilst it is due to candor to say, that had I been on the jury, as then impressed by the testimony, I should have been reluctant to set aside the deed to Maddox, I feel that

*now,* I must not attempt to control the deliberate finding of the jury, and that to do so, would be a flagrant violation of the great principle which separates the powers of the Judge and the jury.

"It is impossible to peruse the testimony, as to the capacity of mind of Simmons, without perceiving *great conflict of opinion.* In such case, who are to decide? Who have the exclusive right to settle the credibility of witnesses? the value and weight of testimony? Who but the jury? And is there not enough in the testimony of his family physician, Dr. Clopton, and in the proof by others, of Simmons' unstable, varying dispositions of property, keeping in view his age and health, to make it very uncertain whether he had mind enough to make a contract of the kind sought to be set aside?

"The jury (and it was one distinguished by intelligence and character, and perfect impartiality) thought that Green Simmons had not that degree of mental capacity necessary to the making of such an instrument.

"How easy was it, then, after that point was agreed on, to come to the conclusion that the considerations expressed in the deed were grossly inadequate—indeed, unconscionable, for such an amount of valuable negro property as was conveyed by the deed, especially when they look to the offer of Mr. Edmondson of five thousand dollars for the property, payable at his death, with the promise, in addition, of the support of Simmons, in the meanwhile!

"Dr. Maddox, too, was a stranger to the blood of Simmons. Simmons was an old man, between sixty and sixty-three years of age, laboring under consumption. Should not transactions between parties thus situated be scanned closely? How much easier for Dr. Maddox, whom it is presumed was familiar with the nature of diseases, to count the pulses of life with more accuracy than one not of his profession! indeed, to measure its duration with almost certainty, with the important fact, previously ascertained by him, that Simmons had consumption!

"Can it be doubted that the jury gave to these facts their full value, and that they formed some of the elements of their judgment?

"Can any fair-minded man, in reviewing this whole case, come to any other conclusion, than that there are facts and circumstances in it enough to sustain the verdict?

"What I have said, disposes of the ground that the verdict is contrary to evidence. But it is said that the verdict is contrary to law.

"I am somewhat at a loss to perceive how that can be, if there be evidence enough to support the verdict. The two grounds are inseparably allied; so that if the first is not sustained, the second can not be.

"It has been made a ground for new trial, that I did not charge the jury, that the contingency of a recovery of the negroes from Ladd, ought to be considered by them in determining the consideration paid by Maddox.

"The defendants' counsel say they made and argued the point. This may be so. No such request was made of me. Before charging the jury, I stated distinctly that although many requests had been submitted, in writing, by counsel on either side, I would, firstly give my general charge as to the principles of law and equity pertinent to the case, and that if it should not cover all the requests presented, upon my attention being called to it, I would proceed then to charge as to such requests.

"When I had closed the general charge, I desired to know of counsel if there was any request which they desired me to give to the jury, and paused about a minute for an answer; when Mr. Lawson, one of defendant's counsel handed me a single request, instructing the jury 'that they should give more credit to a witness who derived his knowledge from long acquaintance with the conduct of Green Simmons, than to one who forms an opinion from a single transaction;' which was given as desired.

"The matter embodied in this ground was *never asked either, in writing or orally, to be given.* To guard against misrepresentation or misapprehension, it is an established rule of the Ocmulgee Circuit, that all requests must be handed in before the general charge is made. In the case under consideration, the rule was relaxed, and the defendant's counsel had the full benefit of the indulgence.

"It is a matter worthy of note, that the substance or matter of the charge is not contested or complained of. On his occasion, I carefully avoided the slightest reference to any portion of the testimony.

"After stating the rule in equity as to responsive answers, and how only they were to be outweighed to enable the jury

clearly to determine thereby how stood the charges as to fraudulent combination of John and Wm. Maddox—imposition by John Maddox on Simmons—and of the undue influence of John Maddox over the mind and conduct of Green Simmons, I then proceeded to say, from the course of the argument in the cause, it was apparent that the main battle-ground was the alleged gross inadequacy of consideration paid by Maddox for the propery, coupled with the alleged insufficient capacity of mind in Simmons, to make such a contract; both of which must unite before they could set aside the deed on this ground.

"And it is complained of, that I spoke of this last ground as the main battlefield.

"It is very difficult to satisfy the complaints of a losing party. If the remark was exceptionable, it surely was not prejudicial to defendant. With much more show of reason could the plaintiffs have excepted to it.

"But it is gravely asked that a new trial be awarded, for that the 'manner' and 'emphasis' of the Court misled the jury.

"This ground has the merit, at least, of novelty.

"Now, before considering it, let it be borne in mind that the propositions in reference to inadequacy of consideration charged, were—

"1st. That the law required a higher degree of capacity to make a contract than it did to make a will. What that grade was, had not been clearly defined, but it certainly required memory of one's property; a knowledge of what he was doing; judgment and free assent.

"2. That equity abhorred unconscionable bargains; but before it would set contracts aside, two things must unite— incapacity of mind to make a contract, and gross inadequacy of consideration.

"These legal propositions are not disputed; no error alleged against their truth, as principles controlling Courts and juries; but the 'manner' of charging them, and the 'emphasis' with which they are alleged to have been charged, is the burthen of complaint.

"I reply, that I am utterly unconscious that on that occasion my manner or emphasis was so marked, as to give the plain words and plain principles a meaning beyond what they naturally conveyed. The charge was calm, passionless, deliber-

Maddox vs. Simmons and Griffin.

ate, and, I think, perspicuous—the intonations of voice even, and so regular as almost to be monotonous.

"Indeed, it is difficult to conjecture how legal abstractions, such as those given in charge, can admit of change by manner or emphasis. I think I have rather too much good taste to attempt at any time to mark such plain and simple truisms as those given in charge, either by such 'manner' or 'emphasis' as I would repeat some of the remarkable passages of Shakespeare, drawing out a latent beauty or thought which had escaped the cursory reader.

"This ground speaks little for the estimate defendant's counsel have of the intelligence or fairness of the jury; it is, moreover, an indirect and covert imputation upon the judge. Self-respect and the dignity which should characterize, at all times, the deportment of this officer, forbids that he should meet any intended imputation otherwise than by saying, it is unfounded; that it is the offspring 'of a heat oppressed brain,' 'a bodiless creation,' indefinable, intangible. That my 'manner' and 'emphasis' may be at all times peculiar and characteristic, I am quite ready to admit; for they are my own, not borrowed. If earnestness and perspicuity are, as it would seem, reprehensible, then to meet the taste and talent of those disposed to be querulous, insipidity and obscurity must be substituted.

"I dismiss this topic without other comment than I have made—less, probably, than it should have provoked, when it is remembered that the counsel by whom this ground was inserted in the motion for new trial, *knew, and had been told by me before the verdict was rendered,* that I thought the plaintiff's case had not been as well made out as it should have been."

## JUDGMENT.

Whereupon, it is considered and adjudged by the Court, that the judgment of the Court below be reversed, upon the ground that the verdict was strongly and decidedly against the weight of evidence.