[*171]　　　　　　　　*CLARK AND OTHERS *v.* FISHER AND OTHERS.

A person, to be capable of making a will, must be possessed of a sound and disposing mind and memory, so as to be able to make a testamentary disposition of his property with sense and judgment, in reference to the situation and amount of such property and the relative claims of the different persons who are or might be the objects of his bounty.

Where the derangement or loss of the powers of mind some time previous to the making of the will is established, it devolves upon the party who seeks to maintain the will to show that such incapacity had ceased at the time it was executed.

In forming an opinion of the state of the testator's mind, it is proper to take into consideration the reasonableness of the will in reference to the amount of his property and the situation of his relatives.

Whenever a person, whose mind is imbecile from disease, is induced by fraud, imposition, or undue influence, to make a testamentary disposition of his property different from what he would have done in the full possession of his faculties, the same will be set aside.

Surrogates, having exclusive jurisdiction in relation to the proof of wills of personal property, must determine all questions of fraud, imposition and undue influence in procuring such wills, as well as the general question of the capacity of the testator.

August 25th.　　THIS was an appeal from the sentence and decree of the surrogate of Kings county. A statement of the case is contained in the opinion of the Chancellor.

*Wm. Kent* and *D. B. Ogden*, for the appellants:—The testator had not sufficient capacity to make a will. His mind was so enfeebled as to render him an easy prey to fraud and imposition. The possession of memory alone is not sufficient to capacitate a person to dispose of his property by will; he must know all his relations, their claims

upon his bounty, and the extent of his property, so as to be able to make a judicious disposition. He must have a sound and disposing mind and memory, so as to be able to make a will with understanding and reason. (Swinb. on Wills, part 2, sec. 3; Moore's R. 759; *Marquis of Winchester's case*, part 6, vol. 3, Coke's R. 23, a.) More mind is required in making a testament than a contract. (2 Evans' ed. of Pothier on Oblig. 539.) The testator presents a case of a broken down, enfeebled, expiring intellect; of a mind reduced to second childhood, with some little glimmering of reason remaining. After the mind is gone in old men, memory often remains; and garrulity is *even evidence of the departure of reason. It is incumbent upon the respondents to show a capacity in the testator to make a will at the time he executed the one in dispute; it having been established that he was incapable at a time previous thereto. (1 Phil. R. 535, 567, 570; 4 Cowen's R. 287.) There was in this case a conspiracy to obtain the will from the testator. He was induced to make it through the undue influence of his wife. A palpable fraud was committed in imposing upon him the beggar girl as his niece. The rule applies, *falsus in uno, falsus in omnibus.*

*D. S. Jones* and *P. A. Jay*, for the respondents:—Only collateral relatives contest this will. The wife of the testator has no interest in sustaining it. Her share of the estate will be increased by setting it aside. The disease of the testator only affected his body and not his mind. The evidence as to his capacity is mere matter of opinion. The court should not rely upon the opinions of the witnesses, but upon the facts upon which they found their opinions. Opinions, in a case like this, always vary. The difference arises from the different opportunities the witnesses have of seeing the testator, and from their different abilities. (*Kinlyside*.v. *Harrison*, 2 Phil. R. 454.) The same mind is required in making contracts as testaments. (1 Shep. Touch. 403.)

1828.

Clark
v.
Fisher.

[*172]

1828.

Clark
v.
Fisher.

[*173]

THE CHANCELLOR :—This cause comes before this court on an appeal from a sentence and decree of the surrogate of Kings county, allowing and admitting to probate an instrument propounded by the respondents as the last will and testament of John Fisher, late of Brooklyn, deceased. The two Mrs. Clarkes are the nieces and next of kin of the deceased, who left a large real and personal estate. He died in May or June, 1827, being then about 80 years of age. About four years previous to his death, and about one year before the death of his first wife, he had an apoplectic fit, which terminated in paralysis, and continued until his death. He was confined to his bed for the four years, but was able to ride out a few times, being helped into the carriage. His speech was much impaired, but he was at times able to make himself understood by those who were well acquainted with him. In the fall of *1824, he was married to Diana Rapelje, the respondent, a sister of his first wife. The will in controversy was executed in May, 1827, shortly before his death ; and he thereby gave all his property, real and personal, to his wife, in fee ; but afterwards, in the same will, he gave one-fourth of his property, after the death of his wife, to a supposed daughter of his deceased brother, Lawrence Fisher, and the annual interest thereon for her education, and the remaining three-fourths to the heirs of Eleanor Clarke, Maria Clarke, Ann Smith and Isaac Rapelje. The respondents were made executrix and executor, with a general power to sell. Lawrence Fisher, in fact, died without issue ; and the pretended niece was a child which his widow had stolen from the alms house, and claimed as her own.

The appellants insist that the testator was incompetent to make a will, or if not wholly incompetent, that the same was procured by fraud and imposition, and by taking an undue advantage of his situation. Between fifty and sixty witnesses were examined to these questions by the different parties before the surrogate.

The general principles of law in relation to the capacity

of a person to make a will, are well understood. He must be of sound and disposing mind and memory, so as to be capable of making a testamentary disposition of his property with sense and judgment, in reference to the situation and amount of such property and to the relative claims of the different persons who are or might be the objects of his bounty.[1] (Marquis of Winchester's case, 6 Coke's R. 23. *Den* v. *Johnson*, 2 South. Rep. 458.) But the great difficulty which generally exists, is in applying these principles to the testimony in each particular case. The evidence of capacity on which the court or jury are to decide in most contested cases, consists in the opinions of witnesses, sometimes with, but frequently without, the particular facts on which such opinions are founded. Such testimony is always the most unsatisfactory, and the least to be depended on. Our opinions are much more frequently founded on prejudices, or biased by our feelings, than we are aware of. Hence it frequently happens that two witnesses, equally honest and intelligent, *form opinions directly opposite to each other, founded on the same state of facts. It is for this reason that the opinions of witnesses are never received as evidence where all the facts on which such opinions are founded can be ascertained and made intelligible to the

1828.

Clark.
v.
Fisher

[*174]

[1] Lord Kenyon, in addressing the jury in *Greenway* v. *Greenway*, 3 Curtiss, said—"I take it a mind and memory competent to dispose of his (the testator's) property, when it is a little explained may stand thus: having that degree of recollection about him that would enable him to look about the property he had to dispose of, and the persons to whom he wished to dispose of it. If he had the power of summoning up his mind so as to know what his property was, and who those persons were that then were the objects of his bounty, then he was competent to make his will." As to the standard of mental capacity requisite, see Verplanck, Senator, in *Stewart* v. *Lispenard*, 26 Wen. 255, 306, 311, 312; *Blanchard* v. *Nestle*, 3 Denio, 37; *Comstock* v. *Hadlyme*, 8 Conn. 265; *Kinne* v. *Kinne*, 9 Conn. 105; *Kachline* v. *Clark*, 4 Wharton, 320.

To revoke a will requires the same capacity as to make one. *Smith* v. *Wait*, 4 Barb. S. C. R. 28. Exposition of the doctrine of monomania and partial insanity, as applied to wills, see *Waring* v. *Waring*, 6 Moore, 341, S. C. 6, Jur. 947.

court or jury. And where the opinions of witnesses from the necessity of the case are received as evidence, the weight of testimony will not depend so much upon the number as upon the intelligence of the witnesses, and their capacity to form correct opinions, their means of information, the unprejudiced state of their minds, and the nature of the facts testified to, in support of those opinions.

Testing the case before me by these principles, it is satisfactorily established that at the commencement of the disease of John Fisher, there was a general derangement or destruction of the powers of his mind, so as wholly to incapacitate him to make a will. This is proved by the testimony of his attending physicians; of Robert Lowther, who was with him eleven months in the capacity of nurse; of Bishop Onderdonk, who made him pastoral visits for the purpose of administering spiritual consolation; of Gen. Bogardus, who went to see him several times on business; and of many others who were in habits of intimacy with him before his sickness and who continued to visit him until they supposed his disease incurable and his mind irretrievably gone. In opposition to this, a few persons, of very limited capacity to judge on such matters, testify that he was as capable of doing business during the whole of his sickness as he ever was before.

It being established that there was a general derangement or loss of the powers of mind for a very considerable period some time previous to the making of the will, the weight of proof was thrown upon the respondents to establish the fact that such incapacity had ceased at the time the will was executed. (*Kinlock* v. *Palmer*, 1 Const. R. S. C. 225. *Lessee of Hoge* v. *Fisher*, 1 Peters' C. C. R. 163. *Attorney-General* v. *Parnther*, 3 Bro. Ch. R. 443. Swinburne on Wills, part 2, sec. 3. *Turner* v. *Turner*, 1 Little's R. 102. *Jackson* v. *Van Duezen*, 5 John R. 159. Case of Cochrane's will. 1 Munroe's R. 263.)

\*After the first year of his disease, very few of those persons who had known and associated with him previous to

his sickness, and who alone were capable of comparing his mind in its diseased state with what it was before, visited his house. Among the witnesses who did see him during the last three years of his life there is a very great contrariety of opinion as to the situation of his mind, and even as to the state of his corporeal faculties. I think the weight of testimony is that in the summer of 1826 his mental and corporeal powers were in a more vigorous state than they had been during the first two years of his sickness. The testimony of Dr. Watts, in particular, shows that he could then converse intelligibly; and certainly he exhibited considerable strength of memory in relation to the papers of Lord Sterling. That circumstance, though strongly in favor of his mental capacity at that time, is not conclusive. It frequently happens that some particular circumstance has made a strong impression upon the mind of an individual, and has been thought over so often that the memory on that subject becomes in a measure mechanical; and whenever one link in the chain of circumstances is touched, the whole subject again passes through the mind. Hence it sometimes happens in second childhood, when all traces of recent events have become completely effaced from the memory, the bare mention of some occurrence which made a strong impression upon the mind of the individual in early life, will bring the whole subject distinctly to his recollection; and he will be able to detail every circumstance with the most minute exactness. I am, therefore, not perfectly satisfied, considering the nature of the disease under which Fisher was laboring, that even at that time he was of sufficient capacity to dispose of his property by will with sense and judgment.

Whatever may have been his situation in the summer of 1826, there are still stronger reasons to doubt his capacity in May, 1827, when the will was executed. He was not then in a situation to make himself understood by the person who drew it, even in reply to questions put directly to him. The will was drawn under the direction of the wife,

the principal devisee; and although she professed to *converse with and to understand him, the scrivener had no means of knowing whether he assented to her propositions or not, or whether he understood what was said to him, or what business was transacting. If his mind had been once partially restored, there is reason to believe he was then suffering from another attack of the same disorder, and which carried him off within a few days afterwards. Besides, the will itself is unreasonable on its face, when taken in connection with the amount of his property and the situation of his relatives; and this is always proper evidence to be taken into consideration in judging of the state of the testator's mind. (*Patterson* v. *Patterson*, 6 Serg. & Rawle's Rep. 56.)

But if it were doubtful whether the testator's mind was so far impaired as to render him incapable of making a valid will, there cannot be a question that it was so much weakened, and rendered so imbecile by disease, as to make him an easy dupe to the arts and intrigues of those by whom he was surrounded. Whenever a person in that situation is induced by fraud, imposition, or undue influence to make a testamentary disposition of his property differently from what he would in the full possession of his faculties, the same will be set aside, upon the same principle that a court of chancery sets aside a conveyance of property obtained under like circumstances.

Surrogates having exclusive jurisdiction in relation to the proof of wills of personal property, they must of necessity determine all questions of fraud, imposition, and undue influence in procuring such wills, as well as the general question relative to the capacity of the testator. (*Kerrich* v. *Bransby*, 3 Bro. P. C. 358; *Bennet* v. *Vade*, 2 Atk. R. 324; *Archer* v. *Mosse*, 2 Vern. 8; *McDowell* v. *Peyton*, 2 Desaus. 313; 1 Roberts on Wills, 30.)

In the case of the will of Edward Campion, a court of delegates, consisting of some of the most distinguished judges and civilians in England, set the will aside on the

ground that undue influence had been exercised over the mind of the testator by his housekeeper and physician; and Lord Rosslyn, being satisfied with their decision, reported against granting a commission of review. (*Ex parte Fearon*, 5 Ves. 633.) *In *Hacker* v. *Newbern*, (Styles' R. 427,) Rolle, C. J., held, that a will executed by a man in his last sickness, by the over importunity of his wife and for the sake of quiet, was not valid. In *Dietrick* v. *Deitrick*, (5 Serg. & Rawle's R. 207,) on an issue to try the validity of a will, the person attempting to impeach it on the ground of imbecility and imposition, was permitted to give evidence of the false representations of the principal devisee, as to the character of the wife of another who was equally entitled to the testator's bounty, by reason of which he was disinherited. The same principle is recognized in *Nussear* v. *Arnold*, (13 Serg. & Rawle's R. 323.) And in *Patterson* v. *Patterson*, (6 Idem. 56,) where it was attempted to impeach a will on the ground of imbecility of mind, connected with fraudulent practices by the devisees, the party was permitted to give in evidence the situation of the testator's family connections and property, for the purpose of showing the unreasonableness and injustice of the provisions of the will.

Applying the principles of these cases, and the doctrine held by the Court of Errors in *Whelan* v. *Whelan*, (3 Cow. R. 537,) to the circumstances disclosed by the testimony before the surrogate, this will must be set aside, as unduly obtained by taking advantage of the situation and infirmities of this bed-rid, paralytic old man, by which a different disposition was made of his property from that which would otherwise have taken place. The testimony of Robert Lowther shows, that immediately after the death of the first Mrs. Fisher, her relations commenced a system of intrigue and management for the purpose of getting the control of the person and property of the testator. For this purpose his niece, who had been in the habit of visiting him previously, was virtually excluded from the house;

1828.

Clark.
v.
Fisher.

[*177]

1828.

Clark
v.
Fisher.

[*178]

and means were taken to prejudice the testator against her, by representing in his presence and hearing, that her visits and attentions to him were mercenary. They urged him to get married, as a means of restoring him to health; and the sister of the first Mrs. Fisher was placed about him, and recommended as a suitable person for his wife. In the course of a few months, he was induced to consent to the ceremony of a marriage, which in his situation *never was or could be consummated. Having thus secured the control of his person, a wife was secured for the lunatic brother, and he was importuned to get the testator to make a will in their favor; and after the death of that brother, his widow procured from the alms house a child which was imposed upon the testator as his niece. Although there is no direct evidence of the fact, yet from the intimacy which had existed between the widow of Lawrence Fisher and the respondent Diana Fisher, there is reason to suspect the latter was not ignorant of the deception which was practiced. The testator was then induced to execute this will, giving one-fourth of his property to the supposititious niece, and the residue to his wife for life, with power to her and the co-executor to sell and dispose thereof as they pleased, and what was left after her death was to be equally divided among the children of his nieces, and the descendants of two of her own relations; thus, without any apparent cause, excluding the two Mrs. Clarkes, who were his only blood relations, from any share in his property.

On either of the grounds taken by the appellant's counsel, I am satisfied the sentence and decree of the surrogate, allowing the instrument propounded as the last will and testament of John Fisher and admitting the same to probate, was erroneous; and the same must be reversed.