STANTON and wife, *appellants, vs.* WETHERWAX and others, *respondents.*

On an appeal, when the relief sought is the reversal of the judgment or decree, and a new trial, the court is to take into consideration all the testimony given by the unsuccessful party which was admitted, even erroneously, and on which the court below acted in making up its judgment. And this for the reason that, had the evidence been excluded, the party might have resorted to other proof.

The only exception to this rule is where the court can see that no different state of things could possibly exist, on a new trial.

In the statute concerning wills, the term " unsound mind" is used as synonymous with *non compos mentis.*

When a person conceives something extravagant to exist, which has no existence whatever, save in his own heated imagination, but he is incapable of being reasoned out of that conception, such person may be said to be under a *delusion ;* and the absence or presence of delusion, so understood, forms the true test or criterion of absent or present insanity.

Delusion, in this sense of the word, and *insanity* are convertible terms.

A will made under the influence of a powerful delusion, which has not only impaired but perverted the testator's judgment and understanding in relation to subjects connected with the provisions of the will, so as to exercise a controlling influence in the disposition of his property, is not the will of a person of sound mind; the mind of the testator being unsound quoad the very subject on which he is called to exercise its powers, in making the will.

When a will propounded for probate is alleged to have been executed by the testator under the influence of a *delusion*, it is the duty of the surrogate to inquire and decide the question whether it was so executed.

He should also pass upon the question whether the unsoundness of the testator's mind extended to so many subjects, and perverted his judgment in

relation to so many topics, as to obscure and distort his entire mental faculties, and to amount to a general unsoundness of mind that would entirely incapacitate him from making a rational or valid disposition of his property.

This was an appeal from a decree of the surrogate of Herkimer county, admitting to probate the will of William Feeter, deceased. The will bore date the 21st of August, 1849. Feeter committed suicide in April, 1852. He left him surviving five daughters by his first wife, all married, and four children by his second wife—two daughters and two sons. One of these daughters was married to the respondent Wetherwax; the other daughter and the sons were minors, the sons being the youngest. He left real estate of the value of about $10,000, and personal property of the value of about $1500. The deceased was from 65 to 70 years old. By the will he gave all his property to his two sons, except a legacy of $100 each to the daughters of the first wife, and about $400 each to the two daughters by the second wife. The probate of the will was opposed, on the ground that the testator was not of sound mind. It appeared that after the death of his second wife, and from 1847 to the time of his death, particularly during the years 1848 and 1849, he was in feeble health, his mind diseased, and especially that he was laboring under delusion as to his property and its situation. The evidence of the contestants of the will, described particularly his appearance, conduct and conversation during the period in question, and comprised the testimony of all the medical witnesses who attended him during that time. The evidence of the propounders of the will gave but few facts touching the conversation or particular conduct of the deceased, although these witnesses expressed their opinion that he was competent to do business. The substance of the testimony before the surrogate, is given in the opinion of the court.

*F. Kernan*, for the appellants.

*L. Ford*, for the respondents.

Stanton *v.* Wetherwax.

*By the Court,* GRIDLEY, J. The surrogate decided to admit the will to probate; and this is an appeal from the decree made upon that decision. The appellant seeks to reverse the decision of the surrogate, on the ground that, in making it, he adopted an erroneous rule of law. He adopted the rule that has been held to apply to cases where the objection to the testator's capacity was based on *imbecility of mind,* arising out of a general decay of the faculties by old age, grief, or other causes; and not on the ground of *insanity* or *insane delusion.* Preliminary to this inquiry, however, is another, growing out of the admission of the heirs at law of the testator as witnesses for the contestants, against the objection of the propounders of the will. It is now said that the surrogate erred; and we are asked, on this argument, to strike out of the case the most material portions of the evidence on the part of the appellants. Even if we conceded that these witnesses were improperly admitted, the answer to this demand is, that on an appeal, when the relief sought is the reversal of the judgment or decree, and a new trial before the same tribunal or any other, the court is to take into consideration all the testimony given by the unsuccessful party which was admitted, even erroneously, and on which the court acted in making up its judgment. For the plain reason that, had the evidence been excluded, the party might have resorted to other proof. This principle is clearly expressed in *Elsey* v. *Metcalf,* (1 *Denio,* 326,) by Judge Bronson. The only exception to this rule is where the court can see that no different state of things could possibly exist, on a new trial. Again; granting that the code does not embrace proceedings of this description, before surrogates, yet it is not entirely clear that the rule contained in the 398th and 399th sections of that instrument is not the rule for a surrogate; since those sections have been applied to existing suits—thus introducing a *new general rule,* by analogy to which the proceedings before the surrogate are conducted. It is however enough that for the purpose of this argument we must regard the evidence as properly received.

We come then to the main question, whether the surrogate decided the case on an erroneous rule of law. He obviously ap-

plied to the testator the rule provided for idiots and imbeciles, as stated and illustrated in the Lispenard case. There is, however, another class of persons who may come under the definition of "*unsound mind*" stated in the statute. (2 *R. S.* 56, § 1. *Id.* 60, § 21.) The term "*unsound mind*" is used in our statute as synonymous with "*non compos mentis,*" which, according to Lord Coke and Blackstone, embraces four classes of persons; 1. Idiots from birth. 2. Those who, by sickness, grief, or other accident, wholly lose their reason and understanding. 3. Lunatics. 4. Drunkards, and those who voluntarily, temporarily deprive themselves of understanding. (*See* 3 *Denio*, 41.) This is an accurate definition, provided we are to understand the word lunatic in a large sense, as equivalent to madness, or insane delusion, as the term is used by Sir John Nichol in 3 *Addams' Eccl. Rep.* 78, and not to a *temporary delusion.*

Sir John Nichol, in the celebrated case of *Dew* v. *Clarke,* (3 *Ad.* 79; *Eng. Eccl. Rep. vol.* 2, *p.* 441,) says, "The true test of the absence or presence of *insanity* I take to be the absence or presence of what, used in a certain sense of it, is comprisable in a single term, namely *delusion.* Whenever the patient once conceives something extravagant to exist, which has still no existence whatever but in his own heated imagination; and whenever, at the same time, having once so conceived, he is incapable of being, or at least of being *permanently* reasoned out of that conception, such a patient is said to be under a *delusion,* in a peculiar *half* technical sense of the term; and the absence or presence of delusion so understood forms, in my judgment, the only true test or criterion of absent or present insanity. In short I look upon *delusion,* in this sense of it, and *insanity,* to be almost, if not *altogether, convertible terms.*" Adopting this definition of insanity, there is abundant evidence of the unsound mind of the testator. He was under a deep delusion as to his property and circumstances. Being a man worth fifteen or twenty thousand dollars, he was harassed by the fear of being sent to the poor-house. He was under a delusion in relation to the efforts of certain individuals to obtain a part of his farm by means of false and fraudulent papers. He was under a delusion

Stanton *v.* Wetherwax.

as to certain individuals being about to deprive him of his liberty and to consign him to the state prison. He was under a delusion in relation to his being compelled to make his will by the threats of other individuals. He was under a delusion in supposing he was pursued by the officers of the law, and actually sought to escape from them by going up into his hay loft and concealing himself. He was under a delusion in his idea of the extreme poverty to which he was reduced, and in his idea that the devil was looking out of the potatoes that were placed before him. He was under a delusion in relation to the necessity for dividing his property for fear it would be got away from him, when he offered to give his mittens to John Brown, his chains to John Pickert, and his augers to Samuel Pickert. These are some of the delusions which haunted the testator's mind, and which to him were realities; which drove him to attempt the commission of suicide, at one time; and to effect his purpose by hanging himself, afterwards. He was unwell, and complained often of his head, to many witnesses. He feared his minor children would come to want. He made several wills in the course of a year; by one of which he divided his property equally between his children, saying they were all equally dear to him. As to the will before the court, or one like that in its provisions, he said that it was not his will, but was Adam Keller's will.

The testator was *partially* insane, and something more than a *monomaniac ;* for he was under a strong delusion on more than one subject. A monomaniac may make a valid will, where the provisions of the will are entirely unconnected with, and of course uninfluenced by, the particular delusion. But where there is good reason to believe that the will is the offspring of that particular delusion which has seized his mind, and controls its operations, the rule is otherwise. A will thus made, under the influence of a powerful delusion which has not only impaired but perverted his judgment and understanding in relation to subjects connected with the provisions of the will, so as to exercise a controlling influence in the disposition of his property, is not the will of a testator of sound mind. His mind is unsound quoad the very subject on which he is called to exercise its pow-

ers, in making the will. This then was one of the questions which the surrogate should have considered and decided. (*See Dew* v. *Clarke,* 3 *Addams,* 79; 2 *Eccl. Rep.* 436; 1 *Beck's Med. Jur.* 650, 651.) Again; perhaps the unsoundness of the testator's mind extended to so many subjects, and perverted his judgment in relation to so many topics, as to obscure and distort his entire mental faculties, and to amount to a general unsoundness of mind that would entirely incapacitate him from making a rational or valid disposition of his property. Those questions, in the aspects of them we have considered, should, we think, have been passed upon by the surrogate. He did not pass upon them, but confined his attention to the general question of imbecility of mind.

The decree of the surrogate is reversed; and an issue is awarded, to be tried at the next Herkimer circuit.

[Oswego General Term, April 3, 1853. *Gridley, W. F. Allen, Hubbard* and *Pratt,* Justices.]