In the matter of the probate of two papers propounded as the last will and testament of Anna Maria Forman, deceased.

The general rule is that two or more written instruments, executed at the same time, relating to the same subject matter, by the same party, or between the same parties, should be construed together, and viewed as one instrument.

Two written instruments, executed by the same person, at the same time, may, notwithstanding their repugnancy in certain particulars, or in certain respects, constitute *a* will, or *the* will of such person, and legally and properly be admitted to probate as such.

The point or question of repugnancy or inconsistency in the provisions of the two instruments may be a subject or question for consideration, after the probate of the will, when the two instruments come to be carried into effect, or claimed or acted under, as a will, but does not arise, and cannot properly be considered, in the probate proceedings.

Where one of the attesting witnesses to a will testified that the testatrix told her, in the room where and when the same was executed, before signature, that the paper or papers constituting the same was or were her will; and the

In the matter of Forman's will.

other witness swore that although the testatrix did not say, while she was in the room, where and when the papers were executed, that they were her will; yet, that when the testatrix came to the kitchen to call her as a witness, she told her that she wanted her to witness her will; *Held* that this evidence, together with proof that the testatrix signed the instruments in the presence of the two witnesses, and that they signed their names as witnesses in her presence, and in the presence of each other, was sufficient to show that they were executed and attested in the manner required by the statute.

What is sufficient proof of the testamentary capacity of a testator at the time the will was executed and attested.

The words "*mind and memory*," as used in our statute relating to wills of personal property, and as used at common law, are and were convertible terms.

The question, in respect to testamentary capacity, in the abstract, is, had the testator, at the time, &c., a mind, or mind and memory, sufficiently sound to make a will; that is, to do the thing or act authorized by the statutes; but practically, in most cases, the question is, had the testator, at the time, &c., a mind, or mind and memory, sufficiently sound to make *the* will in question.

The only legal test of insanity is delusion. Insane delusion consists in a belief of facts which no rational person would believe. A person may be partially insane; that is, he may have an insane belief or delusion as to one or more subjects, and not as to others.

Moral insanity is a disorder of the feelings and propensities, and may or may not impair the intellect. Legal insanity is a disorder of the intellect.

Moral insanity, not proceeding from or accompanied by insane delusion, the legal test of insanity, is insufficient to set aside a will.

Where it appeared from the evidence that at the time a will was executed the testatrix despised, distrusted and hated her husband, and probably feared him, and it was a fair inference from the evidence that these feelings towards her husband caused her to execute the will in question; and there was no doubt that she intended thereby to prevent him from getting any more of her estate than was given to him by such will; *Held* that in testing the testamentary capacity of the testatrix, the question was not whether these feelings towards her husband, at the time, &c., were unreasonable, excessive or unjustifiable merely, or even whether they amounted to, or showed, *moral* insanity as to her husband; but was whether these feelings were insane— whether the contempt, distrust, hatred and fear, which she had of and for him, at the time, was *insane* contempt, *insane* distrust, *insane* hatred, *insane* fear; or, in other words, the contempt, the distrust, the hatred, the fear of an insane wife towards her husband.

And, the preliminary proofs showing that the testatrix, at the time when, &c., was competent or had testamentary capacity to execute the will; and that her feelings towards her husband caused her to execute the instrument as and for her will, and influenced her dispositions of property by it; *Held, further,* that it was for the contestants satisfactorily to show that these feelings towards her husband came from, or originated in, or at least were ac-

companied by, delusion as to her husband, his character, conduct, motives or condition.

And the proofs not showing that the testatrix's contempt for her husband, her distrust, fear and hatred of him, when she executed the will, came from, or originated in, or were accompanied by, delusion *as to her husband*, his character, conduct, motives or condition; it was *held* that the testatrix, at the time she executed the will, must be deemed to have had testamentary capacity, and was competent to execute the instrument as her will.

Where a testatrix, at the time she tore up and destroyed a will previously executed by her, was, though not permanently insane, in a condition and laboring under an excitement, which, under the circumstances, incapacitated her for forming or having a reasonable or intelligent intention of revocation; *Held* that such act was not to be regarded as a revocation of the will.

THIS is an appeal from a decree of the surrogate of the county of New York, admitting to probate two papers propounded as the last will and testament of Ann Maria Forman.

The instruments were first admitted to probate on the 8th of June, 1867. From this decree Mr. Forman, the husband of the testatrix, appealed to the Supreme Court, which, at the general term, in November, 1867, reversed the decree of the surrogate, and then remitted the case to the surrogate, directing that the testimony already taken should stand, with liberty to either party to introduce new evidence. The general term, in making this decree, held that the two papers were too inconsistent to constitute one will, and said "The surrogate should find which of the two instruments, if either, is the will. If he cannot determine that, the case on the part of the proponents fails for want of proof." On their second appearance before the surrogate the proponents failed to show which of the two instruments, if either, was the will, and on the 25th of March, 1868, the surrogate made the same decree as before. The instruments were dated February 27th, 1862. The deceased died, insane, on the 27th of February, 1865, leaving a husband and half sister, her only next of kin and heir-at-law, and letters of administration were issued to the husband, the present appellant, April 9th, 1865.

In the matter of Forman's will.

The entire estate, amounting to some $150,000, with the exception of $1000 given to the husband, is given, by the instruments propounded, to persons other than the husband and next of kin and heir-at-law.

Enos B. Forman, the husband, appealed from the decision of the surrogate, on the ground that the execution of the alleged will was not duly proved, and that the deceased was not of a sound and disposing mind at the time of the alleged execution of the will, and that the two papers, being inconsistent, cannot be the last will.

As the two papers admitted to probate were torn to pieces by the alleged testatrix, August 31st, 1864, under circumstances that amounted to a revocation if she were sane at the time, the decree of the surrogate was necessarily a finding that she was at that time insane.

The evidence was claimed to be clear and conclusive that for the last two years of her life she was insane; the witnesses even for the proponent generally conceding that the deceased was insane in March, 1863.

*Henry A. Cram,* for the appellant.  I.  The decedent was of unsound mind, and had not a *disposing mind* at the time of the preparing and execution of the pretended will. *Proofs of insanity :* Her physical condition and symptoms of a character tending to produce and accompanying insanity.  Her capricious conduct, credulity, confusion of ideas, forgetfulness.  The complete change, without cause, in her feelings to her husband.  The contradictory character of her wills.  The delusions under which she labored amounted to unsoundness of mind, such as her delusions about the war; as, for instance, that there was no war, no armies, no battles.  The Prince of Wales—her opinion, before the war began, that he was to be king.  Her delusions as to her food being poisoned; the danger she was in from chloroform, &c.  Her insane delusions about various papers she had executed.  Her delusions as to her

husband; as to his conduct in relation to her property; that he did not give her money enough; that he did not love her; that he wanted to poison her; that he was trying to do it; that her life was in danger from him; that he would put something in her food; poison her with chloroform; was in league with the cook and servants to bring this about; that the servants were trying to poison her; her insane actions and conduct, and occupation; as on the occasion of her being invited to her uncle's funeral; the flags, banners, kites and stones she had in the house; the bells and papers on her doors before she executed these wills; her tin armor; her experiments with the cat; her conduct in reference to the war. She took her views, she pretended, from the *Caucasian* and *Daily News*, and spent her time in getting the flags hung out everywhere, and having her kites flown with patriotic banners attached; and the war did not go on vigorously enough to suit her; and the various other instances detailed by the witnesses. But throwing out of view all the varied evidences of insanity, and taking one single symptom, and that as presented by the witnesses of both sides, and applying to it the strictest and most correct legal test of insanity, the will must be set aside as not her act. The case, by all the witnesses, shows that Mrs. Forman was laboring under several grave delusions as to her husband. Now, take but the single instance of her notion that her life was in danger from him, proved by all the witnesses— her senseless dread of chloroform and poison clearly proved to have existed at the time of the execution of these papers. That they were delusions, even the hostile witnesses had to admit. That there were no reasonable grounds for these notions, nothing that would have induced even a much weaker woman than Mrs. Forman to have entertained them, the case shows. These delusions were so powerful that Mrs. Forman carried them into action, locking her door against her husband, and never admitting

In the matter of Forman's will.

him to her room, a fact undisputed, thus fulfilling Lord Brougham's extremely strict definition, "incapacity to struggle against delusions constitutes unsoundness of mind." The same argument is applicable as to all the other delusions of Mrs. Forman about her husband, in relation to her property, his conduct, his affection, &c. Mrs. Forman, as to her husband, was clearly unsound and a monomaniac, if there be such a thing as monomania, as distinguished from general unsoundness. Now, although the more than doubtful proposition may be conceded, that the acts of a person laboring under such delusions may be valid in matters outside of, and not connected with, the subject of the delusion, yet never will it be permitted that a person dealing with the very subject matter of her delusions, and carrying them out into action, is as to such action sound, and such action valid and her act. "If the mind is unsound on one subject, provided that unsoundness is at all times existing, it is erroneous to suppose such a man really sound on other subjects." (*Lord Brougham,* 12 *Jurist,* 947. *Frere* v. *Peacocke,* 1 *Rob.* 442. *Thomas* v. *Thomas,* 12 *Jurist,* 947. *Grove* v. *Thomas,* 2 *Hagg.* 433. *Dew* v. *Clark,* 3 *Add.* 79. *Hopper Will Case,* 33 *N. Y. Rep.* 624; *S. C.,* 43 *Barb.* 625, *opinion of Leonard, J. Thompson* v. *Thompson,* 21 *id.* 114, *dissenting opin. of Judge Clerke. Stanton* v. *Wetherwax,* 16 *id.* 259.) Denio, in *Hopper Will Case,* (33 *N. Y. Rep.* 624,) says: "Setting aside cases of dementia, or loss of mind and intellect, the true test of insanity is mental delusion. If a person persistently believes supposed facts, which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion; and delusion in that sense is insanity. Such a person is essentially mad or insane on these subjects, though on other subjects he may reason, act and speak like a sensible man. (*Dew* v. *Clark,*

3 *Add. Ecc. R.* 79.) If the deceased in the present case was unconsciously laboring under a delusion, as thus defined, in respect to his wife and family connections, who would naturally have been the objects of his testamentary bounty when he executed his will, or when he dictated it, (if he did dictate it,) and the court can see that its dispository provisions were, or might have been caused or affected by the delusion, the instrument is not his will, and cannot be supported as such in a court of justice."

II. While there is no difficulty in admitting to probate different papers executed at different times as one will, it is submitted that never before have two contradictory papers simultaneously executed been admitted to probate; there is no authority for it; it is against every principle. Both of these papers are not, cannot be, the last will of Mrs. Forman; and neither can be admitted to probate, the evidence in favor of each being equally strong, so that the court cannot determine in favor of either. It is a case of failure of proof. It is a dilemma that no sane person ever before produced or ever will produce. It is a dilemma to which there is no solution, excepting it is to be treated as it should be, as the strongest evidence of insanity, and then the dilemma no longer exists.

III. It was not sufficiently proven that these papers were executed in the manner prescribed by the statute for the due execution of a will. The great preponderance of the evidence, and the most reliable part of it, shows that they were not. Although Mrs. Westervelt testifies that what the law prescribes was done at the time of the execution, when she and the other subscribing witness were in the room with the decedent, her testimony is not entitled to the same consideration as if given by a wholly disinterested witness, which she is not, because in each paper she is named as a residuary legatee; and although precluded from taking any thing under the papers, if admitted to probate, the fact of her being a legatee goes to her cred-

ibility. But this, is not all; her testimony is replete with contradictions of herself, and she is contradicted by several witnesses on both sides, showing that besides having a very poor memory, she swears thoughtlessly, carelessly and recklessly; while Maria Smith, the other subscribing witness, who was examined at great length in reference to various matters, is supported in every essential particular by witnesses on both sides, and by Mrs. Westervelt herself, except in reference to what occurred when the papers were executed. Maria swears that while she was in the room with the decedent and Mrs. Westervelt, when the papers were executed, and in their presence, nothing was said in respect to the papers by Mrs. Forman or any one, or in regard to any thing save her (Maria's) writing after she had signed one of the papers; that Mrs. Forman did not at that time declare the papers, or either of them, to be her will, and did not ask her or Mrs. Westervelt, or both, to become subscribing witnesses; that when Mrs. Forman came down to the kitchen and asked her to go up and sign her name to a paper or papers, which paper or papers Mrs. Forman there told her was her will, Mrs. Westervelt was not present.

IV. "This is evidently a case that should have been submitted to a jury, who understand the secret motives of people of their own kind better than we do, who are engaged in the profession." (From the very able argument of counsel for the proponent in the court below.) See opinion of Sutherland, J., in *Hopper Will Case*, (43 *Barb.* 625.)

V. The Supreme Court decided that both papers could not be admitted to probate, they being too inconsistent to constitute one will. After taking the testimony of the two subscribing witnesses, which the proponents offered with the purpose of determining which paper was last executed, and on all the testimony, it being impossible to determine that one paper was executed after the other, the

surrogate has seen fit wholly to disregard the decision of this court, and has a second time admitted both papers to probate, repeating exactly his first decree. This defiance of the appellate jurisdiction concerns this court more than counsel, but this court is bound by its previous decree; it is *res adjudicata*. This case being here now under exactly the same circumstances as before, this court must, therefore, as before, reverse the second decree of the surrogate.

VI. It would be a mockery and a denial of justice for this court again to send this case back to the surrogate. The result of such a course would only be a new decree of the same kind. This assertion is made on the best authority.

VII. An examination of the additional testimony taken before the surrogate since the case was 'sent' back, and also of the original testimony, will show that it is impossible to show which paper was last executed. The only possible testimony on this subject is that of the two subscribing witnesses; they both have sworn that they could not tell which was first executed; and while one of them pretends that she can now tell which was last executed, an examination of her testimony shows that she does not know and cannot tell, and that on this point she is utterly unreliable and unworthy of all credit.

VIII. The evidence shows that both papers were in fact and in intendment of law executed at the same instant, and neither before the other.

IX. The two papers are so inconsistent that they both cannot be admitted to probate; this is *res adjudicata*. (*Humphrey* v. *Humphrey*, 2 *Curties' Eccl. Rep.* 468. *Pleny* v. *West*, 1 *Rob.* 261.)

X. The additional examination of Mrs. Westervelt taken by the proponents since the case was sent back, now shows that the will was not executed according to the statute, confirming in this respect the evidence of the other sub-

In the matter of Forman's will.

scribing witness, who expressly proved that the will was not so executed. As the case now stands, the proof of due execution entirely fails. (8 *Paige*, 502.)

XI. This court has power to dispose of the case without awarding a feigned issue, and without sending it back again to the surrogate for any action by him. This court takes the place and has the powers not only of the late circuit judge, but also of the late Court of Chancery, in respect to appeals of this character. The late Court of Chancery, by virtue of its general jurisdiction, had and frequently exercised authority on appeal, to declare a paper valid or invalid as a will, and to adjudge that it be admitted to or refused probate. This question was fully considered, and was adjudicated in *Pilling* v. *Pilling*, (45 *Barb.* 86,) and see also *Stewart's Executors* v. *Lispenard*, (26 *Wend.* 320 ;) *Brinckerhoof* v. *Remsen*, (8 *Paige*, 502 ;) *Chaffee* v. *Baptist Mission Con.*, (10 *id.* 85 ;) *Mead* v. *Mead*, (11 *Barb.* 661;) *Mason* v. *Jones*, (2 *Bradf.* 181 ;) *Whitbeck* v. *Patterson*, (22 *Barb.* 84 ;) *Schenck* v. *Dart*, (22 *N. Y. Rep.* 420 ;) *Clapp* v. *Fullerton*, ('34 *id.* 195.) All the evidence which exists on the subject having been produced, and it being obvious that it is impossible to determine which, if either, of the two papers is the last will of Mrs. Forman, it would be a great expense and injustice to the appellant for this court to compel him to go back again before the surrogate, there to find a further denial of his rights, and the authority of this court again disregarded. It is insisted, therefore, that this court should reverse the decree of the surrogate, and make a final decree declaring that neither of the two papers is the last will of Mrs. Forman, and neither can be admitted to probate.

*Thomas Nelson*, for the respondent Rebecca S. Haviland.

*A. A. Redfield* and *E. Pierrepont*, for the other respondents.

*By the Court,* SUTHERLAND, J. The contestants do not contend that the two written instruments, dated the 27th day of February, 1862, were executed under restraint or undue influence. There is no pretense that they were.

The questions, then, presented by the appeal, are four:

1st. Could these two instruments, notwithstanding their repugnancy in certain particulars, or in certain respects, constitute *a* will, or *the* will of the deceased, and legally and properly be admitted to probate as such?

2d. If they could, were the two instruments executed and attested in the manner required by the statute?

3d. If they could constitute, and be admitted to probate as a will, or as one will or instrument, and were executed and attested in due form, had the deceased testamentary capacity when they were executed and attested?

4th. If the preceding questions are decided in the affirmative, the remaining question presented by the appeal is: Should the tearing up of the two instruments by the deceased, on or about the 31st day of August, 1864, under the circumstances, and considering what was said and done at the time, be regarded as a revocation of them, viewing them as constituting one will or instrument?

As to the first question, I am the more willing to say that I think the general term erred in deciding it, when the case was here before, because that impromptu decision was made upon, and probably in consequence of, my suggestion. Further consideration of the question does not permit me to doubt that the point or question of repugnancy or inconsistency in the provisions of the two instruments did not arise, and could not properly be considered, in the probate proceeding; that the two instruments, if executed and attested at the *same time,* could constitute a will, and might properly be admitted to probate as such, notwithstanding their repugnancy in certain

In the matter of Forman's will.

particulars; that the question or point of repugnancy might or would be a subject for consideration, after the probate of the will, when the two instruments came to be carried into effect, or claimed or acted under, as a will.

The general rule is, that two or more written instruments, executed at the same time, relating to the same subject matter, by the same party, or between the same parties, should be construed together, and viewed as one instrument.

I see no reason for making these two instruments an exception to this rule. The repugnancy could not prevent or affect its application to them. The proofs, when the case was here before, were clear and conclusive that the two instruments were executed and attested at the same time; and, if possible, this point is made clearer by the additional evidence before us now.

I do not think that the former impromptu decision of this question, when the case was here before, should, under the circumstances, be regarded as *res adjudicata.*

As to the second question, whether the two instruments were executed and attested in the manner required by the statute, I am clearly of the opinion that the proofs show that they were; and that the surrogate was right in holding and decreeing that they were.

Mrs. Westervelt, one of the two witnesses to the will, swears clearly and positively on this point. She swears that Mrs. Forman told her, in the room, when and where the two papers were executed, before they were signed by Mrs. Forman or the witnesses, when she, Mrs. Forman and Maria Smith were together, that the paper or papers was or were her will. Maria Smith, the other witness, swears that Mrs. Forman did not say, while she was in the room with Mrs. Westervelt and Mrs. Forman, when and where the papers were executed, that the paper or papers was or were her will; but she admits when Mrs. Forman came to the kitchen to call her as a witness, that she then

and there told her that she wanted her to witness her will. The inference, if Maria Smith was an honest and willing witness, is, that she had forgotten that Mrs. Forman called the paper or papers her will, in the room when and where they were executed and attested.

It is not disputed that the proofs show that the two papers were signed by Mrs. Forman in the presence of the two witnesses, and that they signed their names as witnesses in her presence and in the presence of each other.

3d. Had Mrs. Forman testamentary capacity *when* the two papers were executed and attested?

This is the great and interesting question in this very extraordinary case, and *the* question, to which nearly all of the evidence in the bulky volumes of printed evidence relates. The words "persons of non-sane memory," in the statute of Wills of Henry VIII, meant persons of *non-sane* or *unsound mind*. It was held in the *Marquis of Winchester's case*, (5th Coke,) that a person, to make a testamentary disposition of his lands, must have a memory sufficiently sane and perfect to do the act or thing authorized by the statute; that is, to make a testamentary disposition of his lands, with reason and understanding.

The words of our statute of wills as to real property are: "All persons except idiots, persons of unsound mind, &c., may devise," &c. (2 *R. S.* 56.) The words of our statute as to wills of personal property are: "Every male person, &c., of sound mind and memory, and no others, may give, bequeath," &c.

The words *mind and memory*, as used in this last statute, and as used at common law, are and were convertible terms. The use of the words mind and memory as convertible terms is not so unphilosophical as it might at first seem to be, for without memory there could be no mind, properly speaking. Without any memory, a person would be the mere recipient of a succession of present sensations, like the lowest type of animal life.

As the result of the reported cases relating to testa-
mentary capacity, under our statutes, it may be said that
the question of capacity, in the abstract, is, had the testa-
tor, at the time, &c., a mind, or mind and memory, suffi-
ciently sound to make a will; that is, to do the thing or
act authorized by the statutes; but that practically, in
most cases, the question is, had the testator, at the time,
&c., a mind, or mind and memory, sufficiently sound to
make *the* will in question.  (*See the Parish Will Case*, 25
*N. Y. Rep.* 9, &c.; *The Hopper Will Case*, 33 *id.* 619; *The
Lispenard Will Case*, 26 *Wend.* 255; *Clark* v. *Fisher*, 1
*Paige*, 171; *Stanton* v. *Wetherwax*, 16 *Barb.* 259; *Thomp-
son* v. *Thompson*, 21 *id.* 107.)

There is no pretense that Mrs. Forman, when the two
papers were executed and attested, was an idiot, or in a
state of fatuity.   There is no pretense that she was then
a raving maniac.

I think the proofs in this case furnish no reasonable
ground for thinking or saying that she was *then* in a
state of *dementia*—that she was then generally or abso-
lutely insane on all subjects, or in relation to all persons.

The undisputed circumstances attending the execution
of the two papers—her conversation at the time, as testi-
fied to by both the witnesses to the papers—her conversa-
tion with Mrs. Westervelt when she gave her one of the
papers to keep—the preparation of the two papers—her
evident and undisputed purpose in preparing and execut-
ing the two papers—her previously intelligently expressed
intention of doing what she did do—show conclusively
that *when* the two papers were executed Mrs. Forman was
not generally or absolutely insane—that she was not *then*
in the state or condition of *dementia*.   I have read every
word of the evidence in this case—portions of it more
than once—and I think I may say that the proof of facts
and circumstances relating to the conduct and conversa-
tions of Mrs. Forman, prior to and up to the time of her

executing the two papers, do not show that she was not _then_ ordinarily reasonable and intelligent on most subjects, and was not _then_ intellectually able to take care of herself and of her affairs. The proofs furnish no pretense for saying that she was not competent to make a will, when she made the Reynolds will, in 1859, or the De Witt will, in August, 1861.

The proofs do not show any change in her conduct or conversation between the making of the De Witt will and her execution of the two papers in question, from which it would be reasonable to infer that she had become generally or absolutely insane, when the two papers in question were executed. Mrs. Westervelt, one of the witnesses to the two papers, swears that she did not suspect, when Mrs. Forman executed them, that she was of unsound mind. Maria Smith swears that she thought she was then of unsound mind. Other witnesses, including Mrs. Forman's husband, expressed the same opinion. Other witnesses expressed the opinion that she was then of perfectly sound mind. There probably never was a case where the bare expression of the opinions of witnesses, not experts, on such a question, was entitled to less weight. Most of them, pro and con, were and are deeply interested in the decision of the question, pecuniarily and otherwise. Mr. Forman, the husband, the prominent contestant, and perhaps the most important, prominent and industrious witness on that side, stood and stands with open hands, willing and eager to catch and take, use and enjoy, whatever the law will give him, as husband and next of kin, or either, of his poor wife's estate, if she is judicially declared to have been insane when she executed the two papers in question. I do not wish to be uncharitable to Mr. Forman, but I must say that his position in the case; his interest in the case; his industrious efforts to make out that his wife was insane, insane generally, insane absolutely; his unjustifiable conduct in forcing her into a pri-

In the matter of Forman's will.

vate mad-house, as he did, with the aid of the police, without any legal proceeding, or legal adjudication as to her insanity, without advising with her friends and relations with whom she was most intimate, and without even the certificate of her physician, or of any physician; his keeping her there for six months without her seeing any of these friends and relations; his conduct in getting the papers from Mrs. Wright and Mrs. Westervelt and putting them into the hands of his wife in the asylum, when and where they were torn to pieces by her; and other circumstances to which it is not necessary to refer; should greatly impair, if not entirely destroy, the weight not only of any opinion of his, on the question of his wife's sanity or insanity, but also the faith and credit to be given to his evidence, as to facts and circumstances relating to her conduct and conversation, when, or where, his evidence is not supported by other evidence, or other circumstances.

As to Maria Smith, perhaps the next most prominent and industrious witness for the contestants, her evidence and her opinions are certainly greatly impeached by her continued servile relation to Mr. Forman, and her manner of testifying, so far as it can be inferred from reading her evidence.

No doctor or expert has, I believe, undertaken to testify that Mrs. Forman was insane when the two papers in question were executed, or at any time prior to their execution.

The only legal test of insanity is delusion. Insane delusion consists in a belief of facts which no rational person would believe. A person may be partially insane; that is, he may have an insane belief or delusion as to one or more subjects, and not as to others. (*Dew* v. *Clark*, 3 *Addams' Eccl. Rep.* 79. *Frere* v. *Peacocke*, 1 *Rob. Eccl. Rep.* 442, 445. *Greenl. on Ev.* § 371, *a*. *Fulbeck* v. *Alison*, 3 *Hagg.* 527. *The Hopper Will Case*, 33 *N. Y. Rep.*, *before cited*. *Stanton* v. *Wetherwax*, 16 *Barb.*, *before cited*.)

Was Mrs. Forman, at the time she executed the two

papers, *partially* insane? Or rather, to state at once the question in this case, *was she insane on the subject of her husband?*

Mrs. Forman's estate amounted to some $150,000. She was married in 1851. In 1855 her father died. In 1855, after her father's death, she made a will by which she gave her husband the bulk of her estate. She made another will in 1859, by which she gave her husband less. In August, 1861, about six months before she executed the two papers in question, she made another will, by which she gave her husband still less. By the two papers in question she gives her husband a bare pittance of $1000. She had no children or descendants. She had collateral relations, cousins, &c., and one half sister, Mrs. Haviland, her heir-at-law. She disliked Mrs. Haviland, and I believe she is not mentioned in the two papers, or in either of the wills. This dislike and exclusion of Mrs. Haviland from her wills is accounted for, without resorting to any theory of insanity, or of insane delusion.

There is no doubt, when the two papers in question were executed, that Mrs. Forman despised, distrusted and *hated* her husband, and I think *then* feared him. Certainly there is no doubt that soon after the execution of the two papers, and while she had one of them in her possession, in her room, or in the house, and up to the time she was forced to the asylum, she greatly feared him, and even the servants in the house, whom she thought he might control. It is a fair inference from the evidence, that *these feelings towards her husband* caused her to execute the two papers in question. There is no doubt that she intended, by them, to prevent her husband from getting any more of her estate, on her death, than he would get by them.

Now I think it must be conceded, as matter of law, if the evidence in the case satisfactorily shows that these feelings towards her husband, at the time she executed

the two papers in question, proceeded from, or originated in, an insane delusion, then the evidence shows that she was not competent, or had not testamentary capacity to execute the two papers in question, as, or for, a will, or her will. The cases I have before cited are sufficient to show this, I think.

But it must be particularly noted that the question is not whether these feelings towards her husband, at the time, &c., were unreasonable, excessive or unjustifiable morally, or even whether they amounted to, or showed *moral* insanity as to her husband; but the question is, whether these feelings were insane—whether the contempt, distrust, hatred and fear, which she had of and for her husband, at the time of the execution of the two papers in question, was *insane* contempt, *insane* distrust, *insane* hatred, *insane* fear; or, in other words, the contempt, the distrust, the hatred, the fear, of an insane wife towards her husband.

I do not know that what is called *moral* insanity has a place in civil cases, and in civil courts. I do not know that, legitimately, and properly, it has a place in criminal cases, or in criminal courts.

I repeat, that by the reported cases, and by the books, delusion, hallucination, is the legal test of insanity. Moral insanity is a disorder of the feelings and propensities. Legal insanity is a disorder of the intellect. Dr. Prichard describes moral insanity as "consisting in a morbid perversion of the feelings, affections and active powers, without any illusion or erroneous conviction impressed upon the understanding." Moral insanity may, or may not, impair the intellect, or intellectual faculties. Moral insanity not proceeding from, or accompanied with, insane illusion, the legal test of insanity, is insufficient to set aside a will. (*Frere* v. *Peacocke*, 1 *Rob. Eccl. R. and other cases before cited. 1 Jarman on Wills*, 66. *Greenwood* v. *Green-*

*wood,* 3 *Curteis' App.* III. *Boyd* v. *Eby,* 8 *Watts,* 72. *Prichard on Insanity in relation to Jurisprudence,* 16, 19, 30.)

The question of testamentary capacity, in this case, is, was Mrs. Forman, at the time she executed the two papers in question, legally insane as to her husband? Not, was she *then morally* insane as to her husband. The question of insanity as to her husband is not, were her feelings towards her husband, when, &c., unreasonable, unjustifiable or unusual, but is, were these feelings founded on, or did they proceed from, or originate in, delusion—*insane* delusion? I think these feelings account for all of her conduct and conversation reliably proved in this case, claimed by the contestants to show that she was insane as to her husband, when the two papers in question were executed. They account for her complaints of her husband. They account for her complaints that he did not render her accounts, or satisfactory accounts, of her property. If he did render them, these feelings towards her husband account for their not being satisfactory. But did he ever render her any accounts of her property, or of its income? I must confess I doubt whether he ever did. Not one was produced. He brought into court the round stones that she had picked up. He counted them, or had them carefully counted, so that he could say how many there were. He produced the banners, the kites, the tins, and the doggerel, or doggerels, about the "raids," or "duping raid;" but why, if he had from time to time rendered her these accounts, was not one of them produced? The fact that he ever gave her these accounts, or any account, is shown alone, I think, by his evidence. I have already made a remark, which I do not wish to repeat, as to the credit to be given to his evidence when it is unsupported by any other witness or circumstance.

The feelings of Mrs. Forman towards her husband, especially her fear of him and of the servants in the house whom she supposed under his influence, aggravated by

In the matter of Forman's will.

her physical ailments; her loneliness and seclusion, after she and her husband occupied separate rooms; considering her education, character, and want of occupation, account for her conduct in and about her room, after such separation; for the bells on the doors; for her fear of chloroform; for her putting the slips of paper over the cracks; for her fear of being poisoned; for her conduct as to her food, not eating at the table, &c. Of course these feelings are sufficient to account for her request that she and her husband should occupy separate rooms and beds. But there is one of the witnesses—I think, Mrs. Westervelt—that hints that Mrs. Forman told her that there was another, or an additional, cause for this request, which either Mrs. Forman was not willing to plainly speak of, or the witness was not willing fully to disclose, and did not fully disclose.

These feelings towards her husband, especially her distrust of him, and of his motive in marrying her, account for her suspicions as to his having got her money out of the banks, and as to the real nature and effect of certain papers relating to property, which she had executed. Of course they account for her complaint that he married her for her money; that he did not pay her as much attention as he did the servants in the kitchen. But it is these feelings, this contempt for her husband, this distrust, hatred and fear of him, which is to be accounted for.

The proofs preliminarily showed that Mrs. Forman, at the time when, &c., was competent, or had testamentary capacity, to execute the two papers as a will. The proofs leave no room for doubt that her feelings towards her husband caused her to execute the two papers as or for her will, and influenced her dispositions of property by them.

It was for the contestants satisfactorily to show that these feelings towards her husband came from, or originated in, or at least were accompanied with, delusion as to her husband, his character, conduct, motives or condition.

In my opinion the contestants did not show this. I go farther. In my opinion the proofs in this case do not furnish reasonable ground for suspecting that Mrs. Forman's contempt for her husband, her distrust, fear and hatred of him, when she executed the two papers, came from, or originated in, or were accompanied with, delusion *as to her husband,* his character, conduct, motives or condition. Mrs. Forman appears to have been the pet child of a kind and indulgent father. Her father was a respectable mechanic, who acquired considerable property by industry and economy. He educated this daughter at the most fashionable boarding schools. She married Mr. Forman in 1851, she being then about 43 years of age, and he about 48, after a most common-place and cool courtship of years. She probably married Mr. Forman at the suggestion or by the advice of her father; certainly without any enthusiastic love on either side. Her father died in 1855, but before his death had given her all his property. She made a will in 1855, after her father's death. Up to this time she and her husband appear to have got along very well together, *but they had no children,* and never had any. With less affection for her husband, she made another will, in 1859; with less affection for her husband she made another will, in 1861; with no affection for her husband, and with feelings of contempt, distrust, hatred and fear of, and for him, six months afterwards she executed the two papers in question.

From the proofs in this case, Mr. Forman appears to have been at the time of his marriage, and to have continued to be, a common-place, cool, complacent, calculating, circumspect man, without vices or virtues to excite or attract the attention of men or women; with little education, and with little means, and at the time of his marriage, and for some years afterwards, engaged in a business which, of all others, was least calculated to add to or expand the ideas that he had. After he left off

business, in 1858, he appears to have had nothing to do but to attend to his wife's property, collect her rents, &c.

If the history which the proofs in this case give of this man, and his poor wife, who died in a private lunatic asylum, after being forced and kept there for nearly two years, without any adjudication of her insanity, (unless the *habeas corpus* proceedings, months after she was put there, involved such adjudication,) does not sufficiently account for Mrs. Forman's feelings towards her husband when the two papers were executed, without resorting, or the necessity of resorting, to any supposition or theory of insane delusion or hallucination as to her husband, his conduct, motives or character, *then these feelings are not accounted for by the proofs in this case.* These proofs do not show *that these feelings came from, or originated in, or were connected with,* any insane delusion *as to her husband,* or of which he, his character or conduct, was the subject. A wife may trust or fear her husband unreasonably, or love or hate him excessively, without being expected to give very satisfactory reasons for it. Mrs. Forman, on one or more occasions, was reminded of the apparent kind and affectionate attentions of her husband. She said, yes, "but a man could smile, and smile, and be a villain." I do not say that she did not mistake the character and designs of her husband. I do not say that he did intend to poison or chloroform her, to get her will or her property. I do not say that he was or is a villain. But I do say that the proofs in this case do not satisfactorily show that her fear and hatred of her husband came from insane delusions of or about him, his character or designs. A wife may fear and hate her husband excessively, without being crazy.

Mr. Forman never treated (I mean by acts) his wife as insane, until he took her to the asylum. He treated her as sane after she was there, by getting her to execute certain papers respecting her property. He ought not to be

---

---

permitted to say that he did not treat her as sane by getting the two papers in question, and handing them to her in the asylum. No doctor certified to her insanity, until months after she had been in the asylum, and a stir had been made about her confinement.

There is much evidence which, the contestants claim, shows that she was insane on certain subjects other than her husband. She was greatly excited about our late war, or rebellion, and hence came the kites, the banners, the doggerel or doggerels about the *raid* or *raids*, her fears about the continuance of the government, and her talk about the Prince of Wales, and our having a king, &c. &c.

She had a passion for gathering round water-worn pebbles or stones from the sea shore, and other places, and hence came her collections of a great number of round stones, or pebbles. Her husband testifies to a conversation with her in the fall of 1860, or beginning of 1861, which, if it ever took place, would go to show that she was deluded, insanely deluded, about a Mr. Vail who had once worked for her father. He swears that she said she was going to put certain pieces of tin, which he found in a certain closet, over her heart, so that this Mr. Vail could not stab her; that she had once seen Vail at a store in Greenwich street, and she ran away as fast as she could. Now it seems that there was a Mr. Vail, who had worked for her father, and as there is no pretense for saying that she had any ground for fearing him, if she did say what her husband says she did, on this occasion, she must have been insanely deluded on this point. Three of the pieces of tin were produced before the surrogate and identified by her husband. Miss Denham had also seen the piece or pieces of tin in the closet, or in Mrs. Forman's possession; but she explains for what natural and useful purpose Mrs. Forman might have got and used them. I believe the evidence of Mr. Forman, as to the conversation about the pieces of tin, stands unsupported by any evidence or circumstances,

except the fact that she had several pieces of tin, and three of them were produced and identified. I refer again to what has been said about the evidence of Mr. Forman as to the conduct and conversation of his wife, when it is unsupported.

Mr. Forman also testifies to a conversation with his wife in the winter or spring of 1861, in which she said that she was jealous of a Mrs. Denham, who, with her husband, had been dead many years, and that when told so, she said, "well, crazy people have got curious notions." I believe this evidence is unsupported by any other witness or circumstance, and I do not believe the conversation ever took place.

There is also some evidence as to Mrs. Forman's great attachment to a certain pigeon, and her eccentric way of trying to catch it in the street, on a Sunday, and I believe on one or two other occasions, in the street.

I have referred to the principal if not all of the subjects other than her husband, as to which it is, or might be, claimed that she was insane when the two papers in question were executed. There may be evidence of some other eccentric conduct or conversation, not connected with or relating to her husband or the two papers in question, or any of her testamentary dispositions of property, which I have not referred to.

You might concede that she was insane, morally or legally, or both, on these subjects other than her husband, without interfering with the conclusion that she had testamentary capacity, when the two papers were executed—testamentary capacity to execute the two papers as a will, or as her will.

A monomaniac, or a partially insane person, may make a will. A believer in witches and witchcraft, in spiritualism, or in the doctrines of Mahomet, may make a will. The proofs in this case do not show, or make it probable, if Mrs. Forman was insanely deluded on any or all of the

subjects, other than her husband, which have been alluded to, that such insane delusion or delusions at all influenced her in preparing and executing the two papers in question, or in making the testamentary dispositions of her property intended to be made by them. Vail was not related to her, and it was not natural that she should think of him, in preparing and executing the papers. He had nothing to expect from her.

There is in these two papers a small legacy to David Coons, a cousin of hers, who, it seems, died in January preceding the execution of these papers in February. This is, I think, explained by the circumstances that the two papers were mostly copied from the De Witt will, and that that will contained a like legacy. David Coons lived in New Jersey, and it is quite probable that the two papers were prepared before she heard of David Coons' death.

My conclusion is, that Mrs. Forman, at the time she executed the two papers in question, had testamentary capacity; that she had then capacity, and was competent to execute them as her will.

The fourth and remaining question is, should the act of her tearing up the two papers, when handed to her by her husband, in the asylum, considered in connection with what she said, at the time, be regarded as a revocation of them as her will.

The counsel of all the parties have argued this case upon the theory that she was then insane and incapable of having or forming an intelligent and rational intention. I do not wish to disturb this concession, nor am I willing to concede that the evidence in this case shows that she was then permanently insane; but I think that the evidence does show that she was, when she tore up the papers, in a condition and laboring under an excitement, which, under the circumstances, incapacitated her for forming or having a reasonable or intelligent intention of revocation.

My conclusion upon the whole case is, that the decree of

the surrogate admitting the two papers to probate as her will, should be affirmed, I have some hesitation in saying, with the costs of *all* parties to be paid out of the estate; but the circumstances of the case are very peculiar, and if my associates, who are to concur or non-concur in this opinion, think that the costs of *all* parties should be paid out of the estate, I am willing to say, with costs of all parties to be paid out of the estate.

Decree affirmed.

[NEW YORK GENERAL TERM, June 7, 1869.   *Geo. G. Barnard, Cardozo* and *Sutherland,* Justices.]