# THE MICHIGAN NISI PRIUS.

## MARCH, 1871.

MARY KEMPSEY, Appellant, *vs.* NANCY MAGINNIS *et. al.,* Appellees.

*Proof of will—order of proofs.*

The law requires that a person in order to make a valid will, should have a sound and disposing mind and memory. The mind need not necessarily be in its full vigor and power, but its faculties should be, so to speak, in working order, with an active power to collect and retain the elements of the business to be performed, for a sufficient time to perceive their obvious relation to each other.

In determining mental capacity, the jury may look at the provisions of the will, may consider the history and relations of the testator, his previous conduct and language in relation to those related to or acquainted with him, and his previous determination as expressed by him as to what disposition he intended to make of his property, as well as the testimony of witnesses who swear to his actual mental condition as witnessed by them at the time of making his will; and may consider the testimony of experts whose opinions are predicated upon certain assumed facts, provided such assumed facts are proved.

The testator need not, in terms request the witnesses to attest the will. It is immaterial how the request is conveyed to the witnesses, if it appear that such request was the free and intelligent act of the testator.

By improper and undue influence, is meant the dominion acquired over the mind of another which prevents the exercise of discretion and destroys free will.

Admissions made by legatees or others, after the execution of the will, as to the sanity of the testator, are not admissible as bearing upon the question of mental capacity.

Conflict in testimony—Rules as to weighing evidence, discussed.

*Kalamazoo Circuit, March,* 1871.

*Sherwood & Edwards,* for Appellant; *C. S. May,* of Counsel.

*Wm. Fletcher,* for Appellees; *D. Darwin Hughes* and *H. F. Severens,* of Counsel.

*Charge of the Court,* BROWN, J.—Gentlemen of the Jury:—
A certain instrument in writing, purporting to be the last will and testament of Thomas Patterson, was admitted to probate in the Probate Court of this county. An appeal has been taken from the

decree of that Court, and the issue now is as to the validity of that instrument.

The contestants claim that the will is invalid for these reasons:

1. That the will was not executed and attested in the manner required by law; that the mark at the end of the will was not declared by the testator to be his signature, and that the witness, Abbott, was not requested by the testator to sign the will as a witness.

2. That when the will was executed the testator was not of sound mind and memory; that he was attacked on Tuesday or Wednesday, the 12th or 13th of December, 1865, with *pleuro pneumonia*, of which disease he died on the evening of Saturday, the 16th; that the progress of the disease was such that on Friday, his right lung was completely hepatized, and that the disease was then in its first and second stages in the left lung, and that the effect of such disease at that time was to render the testator incapable of transacting any business requiring an exercise of the judgment, the reasoning faculties and a consecutive continuation of thought, and that he was then incapable of planning and executing such a paper as is offered as his will.

Every person of twenty-one years of age and upwards, of sound mind, may devise, bequeath and dispose of his property by his last will and testament in writing.

The validity of the instrument under considertion depends upon the existence of the following facts:

1. That Patterson was, at the time he is alleged to have executed the instrument twenty-one years of age or upwards.

2. That he had sufficient mental capacity to make the same.

3. That it was signed by him or by some one in his presence and by his express direction.

4. That it was attested and subscribed in the presence of the testator by two or more competent witnesses.

In the first instance it devolves upon the proponents of the will to establish all these facts *prima facie ;* and by *prima facie* we mean such evidence as satisfies the mind, unless rebutted.

When the proponents have presented evidence which they deem sufficient for this purpose, they rest their case, whereupon the contestants offer their proofs tending to invalidate the will. Such evidence constitutes the contestant's case. And the proponents then

offer evidence tending to rebut that introduced by the contestants. The contestants then introduce testimony tending to impeach that offered by the proponents; but are not permitted to go into any new matter in support of their original case.

This is the third week of the trial of this cause, and now after having patiently listened to the evidence and arguments of counsel, you are to say whether the facts are such as, when the law shall be applied to them as directed by the Court, the instrument under con. sideration embodies the legal declaration of Thomas Patterson's intentions of what he willed to be performed after his death.

No particular form of words are necessary to make a valid will. Words are used to express ideas and intent. And if the idea and intent may be gathered from the words, that is all that is necessary in this particular. The law does not require of a testator, in order that he should make a valid will that he should dictate the form and framework of the instrument; but the substance must be his, and he must declare it to be his last will. As to the signature it is sufficient if it be by a cross or other mark by the testator as and for his signature.

You are to find from the evidence whether Thomas Patterson was of lawful age and of sound mind; whether in making what is claimed as his will he acted freely and not under restraint or was subjected to undue and improper influences. In short, whether it was made, signed, published and attested with the requisites and in the manner prescribed by law.

Does the paper here offered and propounded for probate contain and embody the designs and intent of Patterson as to the disposition of his property?

Upon the question of mental capacity—as to what degree is necessary to enable a person to make a valid will—I advise you in the language of my learned brother, Judge Littlejohn, who presided at the former trial of this cause: "Aside from the requisite formalities in the making of a will, the law defines the requisite soundness or mental capacity of the testator in this wise: A will is not valid unless the testator not only intends of his own free will, to make such a disposition, but is capable of knowing what he is doing, of understanding to whom he gives his property and in what proportions, and

whom he is depriving of it as heirs, or as devisees under the will he makes.

" If a testator has mind enough to know and appreciate his relations to the natural objects of his bounty, and the character and the effect of the dispositions of his will, then he has a mind sufficiently sound to enable him to make a valid will.

" If the jury should be satisfied that though the testator's mental powers had become enfeebled through mental decay or disease; he still had disposing mind, and if you find the evidence sufficient to show that he fully understood and intended to make the disposition which he has made of his property, then the will must stand, as touching the question of mental capacity or soundness, however unnatural or unjust its provisions may appear. Such are the tests the law prescribes for the guidance of courts and juries."

Upon this same question, our own Supreme Court in passing upon this very case, (20 *Mich.,*) uses the following language :—
" But what degree of mental capacity is necessary to enable a testator to make a valid will, to what extent and with what degree of perfection he must understand the will and the persons and property affected by it, or to what extent his mind must be impaired to render him incapable, is a question of law, exclusively for the Court, and with which the witnesses have nothing to do. And it is a question of law of no little difficulty, which calls for the highest skill of competent jurists, and upon which the ablest courts are not entirely agreed. The rule settled by the weight of authority undoubtedly is, that a less degree of mind is requisite to execute a will than a contract; and though the testator must understand substantially the nature of the act, the extent of his property, his relations to others who might, or ought to be objects of his bounty, and the scope and bearing of the provisions of his will, and must have sufficient active memory to collect in his mind, without prompting, the elements of the business to be transacted, and to hold them in his mind a sufficient, length of time to perceive at least, their obvious relations to each other, and be able to form some rational judgment in relation to them *(Parish Will Case,* 25 *N. Y.,* 9) ; yet it is quite clear, from the great weight of authority, that he need not have the same perfect and complete understanding and appreciation of these, matters, in all their bearings, as a person in sound and vigorous health of

body and mind would have. Nor is he required to know the precise legal effect of any provision contained in his will, for upon this, even the draftman of the will, though competent, and in full possession of all his faculties, may often fail; and even the best lawyers may not be able to pronounce with certainty till the question is settled by judicial authority."

The term "sound mind," in the statute, does not mean that the testator shall have the same command of his mental faculties that he may have when in health. The law recognizing that wills are often made *in extremis*, when the bodily powers are breaking and the mental faculties are enfeebled, only requires that the testator shall retain so much of his mental power as will enable him to understand his relations to those who would be the natural objects of his bounty, the property he wished to distribute and the manner in which he intends to distribute it.

Upon this question I advise you as requested by proponent's counsel :

"That even if the jury are satisfied that the mental powers of Patterson had become enfeebled or disturbed by disease at the time he made the alleged will, still if they find from the evidence that he did yet fully understand and intended to make the disposition which he made of his property, then the will must stand as touching the question of mental soundness or capacity."

You are instructed "that if in the present case you should find from the evidence that Patterson on the day he made the alleged will was delirious, or that his mental faculties were otherwise obscured by the disease from which he was suffering, still this would not necessarily prevent his having sufficient capacity in law to make a will. Delirium or obscuration of the mental faculties by disease must be so complete and so becloud the mind that the testator does not understand the nature of the business in which he is engaged," or does not understand at the time of making the instrument, substantially the act, the extent of his property, his relations to others who might or ought to be the objects of his bounty, and the scope and bearings of the provisions of the will, and does not possess the other qualifications I have already referred to.

The impairing of the mental faculties by the effects of acute disease, such as delirium, or the enfeebling of them from any of the

causes incident to such disease, must be to that extent which deprives him of the use of his reason and understanding to the extent already intimated. For if this is not the testator's situation although his understanding may be to some extent obscured and his memory troubled, yet he may make his will.

There is an essential difference between the apparently lucid intervals in delirium and in general insanity. In delirium the apparent returns to reason may be real and unquestionable, while those which seem to occur in insanity are delusive, the patient being as really laboring under the power of the malady as in the more distinctly marked periods of its progress; but testamentary incapacity does not necessarily presuppose the existence of insanity in its technical sense. Weakness of intellect, whether arising from extreme old age, from disease or great bodily infirmity, from intemperance, or from all these causes combined, when such weakness disqualifies the testator from knowing or appreciating the nature, effect or consequences of the act he is engaged in, renders such testator incapable of making a valid will. See *Wheaton & Stille, Med. Jur.,* § 12.

The law requires that a person in order to make a valid will, should be of sound and disposing mind and memory. And what we mean by soundness in this connection is, not that the mind should be in its full vigor and power, but that its faculties, its machinery, should be in working order, so to speak, with an active power to collect and retain the elements of the business to be performed, for a sufficient time to perceive their obvious relation to each other.

From these considerations you will perceive that the testator must have intended of his own free will to make such a disposition of his property as is made by his will, and must have been capable of knowing what he was doing, understanding to whom he was giving his property, and in what proportions and whom he was cutting off from it as heirs who would otherwise have inherited his estate; and was also capable of understanding the reasons for giving or withholding his bounty as to any of them. In short, the testator, at the time of making the will must have been capable of exercising his judgment, his reasoning faculties and a consecutive continuation of thought.

In determining the question of mental capacity, a wide range is always permitted. The jury may look at the provis-

ions of the will, may consider the history and relations of the testator, his previous conduct and language in relation to those related to or acquainted with him, and his previous determination as expressed by him as to what disposition he intended to make of his property, as well as the testimony of witnesses who swear to his actual mental condition as witnessed by them at the time of executing the will. If a party makes a will contrary to natural justice, this with other facts may be considered. But the mere fact that a will is not exactly according to what our own conceptions of justice would be, is not, of itself, sufficient to invalidate a will, for the reason that sane men are known to disagree in this respect. By "natural justice," we mean that which is founded in equity, in honesty and right.— Natural justice requires that the parent shall care for his children. By bringing them into the world, the parent engages to provide for them. Natural justice requires that the child who has been protected in the weakness of his infancy, should protect and support that parent in the infirmity of his age. There are other relations in the history of every indiviual out of which obligations grow, but which are so varied and embrace so wide a range that human tribunals cannot and do not attempt to enforce them. And wherever the question is presented as to whether a natural obligation has been created, it can only be by enquiring what honor or conscience dictates. But in determining in a case like this, what conscience dictates, we are not to consider alone the fact that this person or that person is a blood relation of the testator. Even under the civil law, where a parent was not allowed to disinherit his child without giving his reasons therefor—and the law recognized fourteen reasons either one of which was deemed sufficient to absolve the parent from what, without such reason would be deemed an obligation founded on natural justice. In short, the conduct of the child towards the parent was to be considered in determining the question as to whether natural justice required the parent to confer any portion of his property upon the child. Did the child refuse to aid the father and to give him his services, and did he refuse to reverence his authority, natural justice did not require

the father to treat the child in disposing of his property, any different from strangers.

I have been requested, and so advise you : " That there is a legal presumption raised by the law in favor of the sanity of all men, and although this presumption is not conclusive, still the jury should consider it in weighing the evidence in the case, of which for practical purposes it forms a part." *Aiken vs. Wickerly*, 19 *Mich.*, 502, 3.

As to the publication of the will, I advise you that no formal declaration is necessary. The statute in that particular is sufficiently complied with if the testator by words or actions indicates that he intends the instrument as his will, and desires to have the witnesses attest it as such.

The testator need not in terms request the witnesses to attest the will. It is sufficient if his desire that they should do so is manifested by an affirmative response to a question whether that was his wish put to the testator by another person, as by a subscribing witness, or in any other way by which such desire might be made to appear, provided that it appear that the request was the free and intelligent act of the testator.

One of the grounds upon which the contestant questions the validity of the instrument offered as a will, is that the testator was unduly influenced in making the same.

Influence is proper or improper. Proper influence is that which one person gains over another by acts of kindness and attention, and correct conduct. 3 *Serg. & Rawle.*, 269. Improper influence is that dominion acquired by any person over a mind of sanity for general purposes, and of sufficient soundness and discretion to regulate his affairs in general, which prevents the exercise of his discretion and destroys his free will.— 1 *Cox's Cas.*, 355. When the former is used to induce a testator to make a will, it will not vitiate it; but when the latter is the moving cause it will 1 *Hagg. R.*, 581; 2 *Hagg.*, 142; 5 *Serg. & R.*, 207; 13 *Id.*, 323; 4 *Greenl.*, 220; 1 *Paige*, 171; 1 *Dow. & Cl.*, 440; 1 *Speers*, 93. And as to whether any such influence was brought to bear upon the mind of the testator as to prevent the exercise of his discretion and to destroy his free will, is a question for you to determine from all the testimony in

the case. This, like the question of sanity is to be considered as relates to the mental condition of the testator.

As touching the question of the validity of the instrument offered as a will, something has been said in the argument about the provision relative to the Allegan lands. Upon this point I advise you as requested :

" If the fact be that in this case John Maginnis, the son of James, was dead, leaving a son by the same name, who was living at the time of the testator's making his will, and there was a son of James Maginnis by the name of James Maginnis, and a brother of said elder James, by the name of Henry, then living, but no son of that name, then the jury are instructed. that such facts would not make the devise of the Allegan lands void, and such incongruities existing in the will are only important on probate thereof, upon the question of mental capacity."

- In this case we have listened not only to the testimony of those who were present during Patterson's illness, and at the time the will was made, but to the testimony of persons denominated as experts in the treatment of disease. These gentlemen have testified as to their opinions predicated upon certain hypothetical or assumed state of facts. To render this testimony of any value, you must find that the assumed facts are real. Upon this point our Supreme Court say : " And as a collection or state of facts assumed, whether few or many, constitute in the aggregate, the basis on which the opinion is asked; if it does not appear that the opinion would be the same, with any of those facts omitted, it necessarily follows, that, if the jury should negative or fail to find any one of the assumed facts, the opinion expressed cannot be treated as evidence, but must be rejected by the jury."

If therefore you should find that in any of the hypothetical, cases proposed to the physicians for their opinion upon the state of facts therein assumed, any material fact or facts are embodied, which are not proved by a preponderance of evidence to have existed in this case, you should entirely disregard and lay out of the case any opinions based by such physicians upon such hypothetical statement, unless it has further been proved

that such opinions would have been the same in the absence of such fact.

From this it follows that if the hypothetical statement or statements of facts assumed in the questions put to the physicians as the basis of their opinions did not include all of the facts necessary to describe the actual condition of the testator, then such opinions must be disregarded and laid out of the case, unless it has also been proved that the opinions would have been the same if such additional facts had been excluded.

The object of this testimony of experts is to bring to bear scientific knowledge as to the natural, proximate effects upon any or all of the intellectual powers resulting from either deranged physical organic functions, or the nature of the disease; and the authorities recognize the law to be that such evidence may tend to throw some light upon the mental *status* and capacity of the testator. You are to give such weight to this class of testimony as you deem it intrinsically demands. In short, you are, in this case, to weigh it by the effect which it produces on your mind, when opposed to the testimony of those who saw the testator when the will was executed, and during his illness.

I now call your attention to some of the rules pertaining to the evidence by which you are to be governed; and advise you that if you find that there is a preponderance of the evidence in the case in favor of all the conditions requisite to the making of a will, then the jury are instructed that they should return a verdict in its favor; and by preponderance of evidence is not meant preponderance in numbers of the means by which the evidence is furnished, but in their efficacy in producing belief.

As to statements made by parties after the execution of the will, I advise you that you are not to take any declaration, admission or statement which the jury may find to have been made by any person since the death of Patterson as proof of any fact therein stated or implied, and this is upon the ground that any such declaration, admission or statement is not admissible proof of any such fact.

There appears to be some conflict in the testimony. It is your duty, if possible, to reconcile this discrepancy; and in your endeavors so to do you will take into consideration the relative situation of the witnesses at the time of the occurrence about which they testify,

and you will thus consider, their means of knowledge. If, upon a careful and critical examination you find that you cannot believe all the witnesses; if you are satisfied that it is impossible to reconcile their testimony, you will enquire who tells the truth and who is mistaken, or who testifies falsely. In determining this question you will bring to bear the knowledge of human nature and character, which you have learned from years of observation and intercourse with those with whom you have been associated and brought into contact. You will consider the appearance of the witnesses on the stand, their apparent anxiety or indifference. You will also consider the interest of the witnesses in the case, their relationship to the parties—whether from all the circumstances you believe any witness was influenced by either party in giving his testimony.

By a provision of our statute the parties to the suit are permitted to testify in their own behalf. While it is not your business to question the policy of this law, it is not improper in weighing their testimony to consider their interest in the matter about which they testify.

Where there is clearly a conflict in the testimony of witnesses you will, in your efforts to arrive at the truth, sift such testimony and determine what and how much of it appears reasonable and probable in view of the circumstances. You are to apply the same tests in the jury room in determining the truth, that you would in your every day intercourse with men. There is no arbitrary rule of evidence which compels a jury to acquiesce in and accept as truth that which appears immaterial, improbable, and from its nature impossible. To illustrate, A swears he saw B strike C with a walking stick with intent to break C's arm. Now there is nothing unreasonable in A's testimony that he saw B strike C, but when he speaks of B's intent he assumes to substitute his own inference for knowledge, and the jury would not be bound to accept such inference as establishing the fact. So, if a witness testifies that two and two make five—that the sun (so to speak) rises in the west instead of in the east—that on a very dark night, without any light, it is as easy to recognize and identify a person across the street as at noon-day; or if a witness testify that the chairs upon which you sit are made of iron; that you have but one arm each—this and like testimony which contradicts the evidence of your own senses you would be bound to reject.

There are two ways of impeaching the credit of witnesses: By showing that the reputation of the witness for truth is bad in the community in which he lives, or by showing that the witness has made statements out of Court or at some other time, under oath or otherwise, contrary to what he states on the stand. The object of all impeaching testimony is to show that the witness who is sought to be impeached is unworthy of belief.

It was formerly held to be the law that if it was evident that a witness testifies falsely in one material particular, the jury are to disregard the testimony altogether, only so far as it is corroborrated by others. The inclination of the Courts, however, latterly, is to hold that the whole question as to the credit of the witness should go to the jury, assuming that their knowledge of human character is a safer guide than any arbitrary rule of law upon that point. Jurors sometimes fall into an error in supposing that they are to determine a case by applying a mathematical rule to testimony. The language of Chief Justice Pennington upon this point is so pertinent, that I quote from that learned jurist the following:

" The circumstances of the case, the probable or improbable nature of the facts detailed, the character of the witness, the manner of his giving testimony, must all be taken into consideration, and ought, after being duly weighed, to carry conviction to the mind of the jury before they give it an effect by their verdict. It is common for jurymen, to say, in excuse for giving a wrong verdict, that they believed it was wrong, but how could they do otherwise. The facts were sworn to, it was the fault of the witness, not theirs. This practice of jurors' loading on the witness their own sins, and making him a scape goat for the whole is grossly improper. It is true that jurors cannot, nor ought they to substitute in the place of proof their own fancies, conjectures or prepossessions, much less to suffer their passions, inclinations or biases to come in aid of proof, but are to govern themselves by the testimony given in the cause. But should a witness relate a fact, which, from its improbable nature, or from the badness of the character of the witness, taken together with other circumstances in the cause, on due consideration, does not carry a belief of the fact home to the minds of the jury, but on the other hand, they believe that what the witness has related is false ; in that case what he has said is no evidence to them, and they are not bound

to give any weight to it; but on the contrary, if they act upon it, or rather make up their verdict on it, such conduct is a departure from their duty, and little short of a violation of their oaths."

Take the case, Gentlemen, and apply to it the rules of law as announced by the Court, and under the solemnity of your oaths render such a verdict as the testimony and law dictates.

Your verdict will be in one of the following forms:

The jury find that the instrument propounded *is* the last will and testament of Thomas Patterson, deceased, or,

The jury find that the instrument propounded *is not* the last will and testament of Thomas Patterson, deceased.

Verdict against sustaining the will.